13 F.3d 406
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Jack F. MOORE and John M. Grau, in their representative
capacity as Trustees for the national Electrical
Contractors Association Pension Benefit
Trust Fund, Plaintiffs-Appellees,
v.
PYROTECH CORPORATION, a Delaware corporation; Coastal
Resources, Inc., a California corporation, Defendants,
AND
Interchem Na Industries, Inc., a British Columbia
corporation, Defendant-Appellant.
 No. 92-3404.
 United States Court of Appeals, Tenth Circuit.
 Dec. 10, 1993.
 
 Before MOORE, ANDERSON, and TACHA, Circuit Judges.
 
 ORDER AND JUDGMENT[1]
 
 1
 Defendant and appellant Interchem (N.A.) Industries, Inc. ("Interchem") appeals from a judgment finding it liable to plaintiffs, trustees ("Trustees") of the National Electrical Contractors Association Pension Benefit Trust Fund ("Pension Fund"). Interchem's liability was based on the district court's determination that Interchem was the successor corporation to Pyrotech Corporation ("Pyrotech"), a defendant along with Coastal Resources, Inc. ("Coastal") in a breach of contract action brought by the Trustees, in which the jury returned a verdict in the amount of $249,455.82 against Pyrotech and Coastal. We affirm.
 
 BACKGROUND
 
 2
 Pyrotech, a Delaware corporation, and Coastal, a California corporation and wholly-owned subsidiary of Pyrotech, were engaged in the business of constructing and operating commercial pyrolysis facilities. Pyrolysis is a chemical process in which wood products are converted into fuel. During the summer of 1988, Pyrotech and Coastal attempted to organize such a pyrolysis project in California (the "Samoa Project"), which Coastal would operate.
 
 
 3
 In order to fund the Samoa Project, Pyrotech and Coastal solicited a ten million dollar investment by the Pension Fund in the Project, to be accomplished by the purchase by the Pension Fund of Coastal preferred stock. In order to evaluate the wisdom of such an investment, and to determine whether the investment would meet the requirements of the Employee Retirement Income Security Act, 29 U.S.C. 1001-1461, the Pension Fund hired various experts to perform a due diligence evaluation of Pyrotech, Coastal and the Samoa Project.
 
 
 4
 In October of 1988, the Pension Fund and Pyrotech and Coastal signed a letter of intent ("Letter of Intent") detailing the specifics of the Pension Fund's proposed ten million dollar investment in Coastal. Included were the following requirements: (1) the Pension Fund would have two positions on the Board of Directors of Pyrotech and of Coastal; (2) the Pension Fund would have a right of first refusal to invest in future Pyrotech-controlled companies and projects; (3) the Pension Fund would have warrants for the purchase of Pyrotech common stock after Pyrotech completed a planned public offering; and (4) Pyrotech and Coastal would reimburse the Pension Fund for its due diligence investigation costs, even if the deal did not close.
 
 
 5
 The Pension Fund never, in fact, invested in Coastal or the Samoa Project. Indeed, the Samoa Project never went into operation because Pyrotech and Coastal were unable to obtain funding.
 
 
 6
 Meanwhile, approximately one month after the Pension Fund, Pyrotech and Coastal signed the Letter of Intent, Pyrotech entered into an agreement with Wolf River Resources, Ltd. ("Wolf River"), a Canadian corporation, and PHC Holding, Inc. ("PHC"), pursuant to which Pyrotech became a wholly-owned subsidiary of Wolf River and Pyrotech's shareholders became shareholders of Wolf River, in what the parties refer to as a "reverse takeover." Specifically, Pyrotech shareholders received shares of Wolf River stock in exchange for their Pyrotech stock. This reverse takeover was completed in June, 1989. Pyrotech did not disclose to the Pension Fund that it had entered into this agreement with Wolf River, even though it did so approximately one month after the Pension Fund/Pyrotech Letter of Intent.
 
 
 7
 Wolf River was a publicly-owned company registered for trading on the Vancouver Stock Exchange. It had been active in mining ventures at some time previously, but was inactive at the time of the agreement with Pyrotech. After the reverse takeover, Wolf River changed its name to Interchem (N.A.) Industries, Inc., and began developing energy projects. Pyrotech, by contrast, became inactive. Pyrotech's Board of Directors prior to the reverse takeover were Gordon Tucker, Lee Derr, Earl King, Bill Ayres and Van Marquis. Interchem's Board of Directors immediately following the reverse takeover were Gordon Tucker, Lee Derr and Earl King, and there was evidence that Interchem intended to appoint Bill Ayres and Van Marquis to the Interchem Board. The same six employees who had worked for Pyrotech began working for Interchem, in the same positions. Both companies had the identical five largest shareholders. Interchem occupied and used the same offices and equipment that Pyrotech had used, and at the same address.
 
 
 8
 The Trustees brought this lawsuit against Pyrotech and Coastal, seeking repayment of their due diligence investigative costs, as provided for in the Letter of Intent. The Trustees thereafter amended their pleadings to add a claim against Interchem on the ground that Interchem should be liable for Pyrotech's debts. The case proceeded to a jury trial, from which Interchem was excused, and at the end of which Pyrotech and Coastal were found liable to the Trustees for $249,455.82. Subsequently, a bench trial was held on the specific issue of whether Interchem should be liable to the Trustees for the judgment against Pyrotech. The district court held that it should, finding that "Interchem is a continuation of Pyrotech." Moore v. Pyrotech Corp., No. 90-2178-0, 1992 U.S. Dist. LEXIS 6425 at * 3 (D. Kan. Apr. 7, 1992). In addition to carefully recounting the details of the reverse takeover transaction, the court observed that its conclusion was also supported "by the indicia of fraud surrounding the reverse takeover transaction." Id. at * 6. The court thereafter denied Interchem's motions for a new trial or alternatively to alter or amend the judgment, and denied the Trustees' motion for Rule 11 sanctions, noting that "although this is a very close case, the court concludes that the conduct of defendants and defense counsel did not violate Rule 11." Moore v. Pyrotech Corp., No. 90-2178-0, 1992 U.S. Dist. LEXIS 16583 at * 6 (D. Kan. Sept. 30, 1992). This appeal followed.
 
 DISCUSSION
 
 9
 Interchem argues the district court erred in finding that it was the successor of Pyrotech, contending that "there is nothing inherent in a reverse takeover which makes Interchem liable for Pyrotech's debts as a matter of law" and that there is no evidence to establish successor liability, or liability under any theory, under Kansas law. We disagree.
 
 
 10
 We begin by clarifying our standard of review, which Interchem argues is de novo and the Trustees argue is clear error. Interchem appeals from the district court's determination, sitting as a court of equity, that Interchem is a successor to or mere continuation of Pyrotech under Kansas law. "Although Erie dictates we apply Kansas law to the merits of this case, as a matter of independent federal procedure we utilize the normal federal standards of appellate review to examine the district court's decision process." Mid-America Pipeline Co. v. Lario Enters., 942 F.2d 1519, 1524 (10th Cir.1991). Under our normal federal appellate review standards, we review a district court's determinations of state law in a diversity case such as this de novo. Salve Regina College v. Russell, 499 U.S. 225, 231 (1991); Green Constr. Co. v. Kansas Power & Light Co., 1 F.3d 1005, 1008 (10th Cir.1993) ("Kansas law governs in this diversity action, and in the absence of state cases on point we will look to other state courts as well as federal decisions."). Underlying factual determinations we review for clear error. Mid-America Pipeline, 942 F.2d at 1524; Fox v. Mazda Corp. of Am., 868 F.2d 1190, 1194 (10th Cir.1989). Ordinarily, "[w]e review a district court's choice of equitable remedies for abuse of discretion," Roberts v. Colorado State Bd. of Agric., 998 F.2d 824, 826 (10th Cir.), cert. denied, 62 U.S.L.W. 3289 (U.S. Nov. 29, 1993), although we review a district court judgment de novo when "the availability of equitable relief depends upon an interpretation of law." Downriver Community Fed. Credit Union v. Penn Square Bank, 879 F.2d 754, 758 (10th Cir.1989), cert. denied, 493 U.S. 1070 (1990); see also McKinney v. Gannett Co., 817 F.2d 659, 670 (10th Cir.1987) (we review application of equitable principles for an abuse of discretion).
 
 
 11
 Thus, in this case we consider whether the district court abused its discretion in imposing liability on Interchem as a continuation of or successor to Pyrotech under Kansas law, and we will only find error if we conclude that the court erroneously interpreted Kansas law, under our de novo review of that law, or if its factual findings are clearly erroneous, after our own careful review of the record.
 
 
 12
 Both parties assert that the primary Kansas case on whether one entity is a successor to another entity, and therefore liable for the other entity's debts, is Avery v. Safeway Cab, Transfer & Storage Co., 80 P.2d 1099 (Kan.1938). Interchem argues that the successor liability doctrine of Avery is premised upon, and only applicable to, a situation where there is a transfer of assets between the two corporations. Interchem argues that, because Pyrotech's assets and financial statements remain the same now as they did prior to the reverse takeover with Interchem, there can be no successor liability for Interchem, as a continuation of Pyrotech, under Kansas law.
 
 
 13
 As the Trustees point out, the district court made a number of important factual findings in reaching its conclusion that Interchem was a continuation of Pyrotech, none of which Interchem challenges in this appeal and all of which we find supported by the record:
 
 
 14
 Prior to the acquisition of Pyrotech, Interchem was a shell corporation called Wolf River Resources Limited. The Pyrotech stockholders, through a holding company called PHC Holding, Inc., exchanged their Pyrotech stock for shares of Interchem. Thus, the former Pyrotech stockholders became the current Interchem stockholders. Generally the two corporations are involved in the same business activity, development of energy products. On two occasions, Interchem publicly claimed Pyrotech's only project as its own, revealing that Interchem considers itself the owner of Pyrotech's assets, or at least considers those assets to be in the family. The officers of Interchem and Pyrotech are identical, each holding the same position in both corporations. Several directors serve on the boards of both corporations. The same employees perform the same functions for both corporations. Both corporations are located in Leawood, Kansas, at the same address. Although Pyrotech continues to file yearly tax returns, it does not appear to be conducting any business activity; conversely, Interchem is active.
 
 
 15
 Moore, 1992 U.S. Dist. LEXIS 6425 at * 3-4.
 
 
 16
 Kansas has adopted the "general rule of nonliability of a transferee corporation for the prior debts of the transferor." Comstock v. Great Lakes Distrib. Co., 496 P.2d 1308, 1311 (Kan.1972); see also Inter-Americas Ins. Corp. v. Xycor Sys., Inc., 757 F.Supp. 1213, 1218 (D. Kan.1991); Kansas Comm'n on Civil Rights v. Service Envelope Co., 660 P.2d 549, 554 (Kan.1983); Mank v. Southern Kan. Stage Lines Co., 56 P.2d 71 (Kan.1936).
 
 
 17
 This general rule permits exceptions, which Kansas also recognizes: "(1) where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporation; (3) where the purchasing corporation is merely a continuation of the selling corporation; or (4) where the transaction is entered into fraudulently in order to escape liability for such debts." Kansas Comm'n on Civil Rights, 660 P.2d at 554 (quoting Comstock, 496 P.2d at 1311). The district court held that Interchem was liable for Pyrotech's debt to the Trustees under both exceptions (3) and (4)--it held that Interchem was a continuation of Pyrotech, and it held that the Pyrotech-Interchem transaction was a fraudulent scheme to "give [Pyrotech] investors a return on their investment ... at [the Trustees'] expense." Both parties agree that this issue invoked the equitable jurisdiction of the district court. See Ramsey v. Adams, 603 P.2d 1025, 1027 (Kan. Ct.App.1979) (corporate veil pierced "[w]hen equity demands"); see also NLRB v. Greater Kan. City Roofing, 2 F.3d 1047, 1051 (10th Cir.1993).
 
 
 18
 Kansas courts appear to be more willing than some other jurisdictions to disregard formally distinct corporate entities. In Avery, the Kansas Supreme Court stated:
 
 
 19
 In our survey of the authorities we note an attitude on the part of some eminent courts to give greater respect to the mere formality of separate corporate entities than is done in this jurisdiction. In Spadra-Clarksville Coal Co. v. Nicholson, 93 Kan. 638, 653, 145 P. 571, 576, Ann. Cas.1916D, 652, Mr. Justice Porter said: "The decisions of this court indicate a tendency to disregard the theory of a corporation as an entity separate from its corporators where justice between the real parties to the transaction requires it."
 
 
 20
 Avery, 80 P.2d at 1102. We see no indication in cases subsequent to Avery that the courts have retreated from this expansive view. There are, however, only a few cases in Kansas which address the continuation exception to successor nonliability. We review those cases to divine the elements necessary to a finding that one corporation is a continuation of another.
 
 
 21
 In Comstock, the Kansas Supreme Court held that one company, Great Lakes Distributing Company, was not a "continuation or reincarnation" of another company, Vulcan, R. & C. Distributors, Inc., because "[n]one of the incorporators of Great Lakes were stockholders or officers of Vulcan at the time Great Lakes was chartered in February of 1965[and] Vulcan was a going business ... and continued as a corporate entity." Comstock, 496 P.2d at 1312. The court further found no evidence of fraud, and stated, "[t]here is no evidence in the instant case of any direct dealings between the two corporations--no transfer of capital stock, assets, contracts or franchises and no evidence of any agreement or understanding between the two corporations." Id. at 1313. Thus, Comstock suggests that common stockholders or officers, discontinuity of the predecessor corporation, and evidence of "direct dealings" between the two corporations all are factors bearing on whether the one corporation is a continuation of the other. The case does not prioritize these factors, however, or intimate whether they are the exclusive factors, or even explain whether all these factors must be present.
 
 
 22
 In Stratton v. Garvey Int'l, Inc., 676 P.2d 1290 (Kan. Ct.App.1984) the Kansas Court of Appeals observed that "[t]he common identity of officers and shareholders in both predecessor and successor entities is a commonly cited criterion in determining the existence of continuity." Id. at 1298. It then stated that:
 
 
 23
 The elements of the continuation exception [are]:
 
 
 24
 "(1) transfer of corporate assets (2) for less than adequate consideration (3) to another corporation which continued the business operation of the transferor (4) when both corporations had at least one common officer or director who was in fact instrumental in the transfer ... and (5) the transfer rendered the transferor incapable of paying its creditors' claims because it was dissolved in either fact or law."
 
 
 25
 Id. at 1299 (quoting Jackson v. Diamond T. Trucking Co., 241 A.2d 471, 477 (N.J.Super. Ct.1968)). Stratton therefore appears to expand the relevant factors to include a transfer of assets for less than adequate consideration, as well as the fact that the transfer rendered the predecessor corporation unable to pay its obligations "because it was dissolved in either fact or law." Id. Additionally, Stratton requires "at least one common officer or director" who was intimately involved in the transfer. In finding that a corporation, Borton, Inc., was not a continuation of a partnership, the Stratton court further observed:
 
 
 26
 Borton, Inc. simply embarked on an established business venture when circumstances left a void in that business upon the death of Chalmers and the required dissolution of the partnership. Borton, Inc. neither claimed any connection with Chalmers and Borton nor solicited business from the former customers of the partnership.
 
 
 27
 Id. (emphasis added). Thus, Stratton suggests that, in addition to the enumerated factors, it is relevant whether the successor holds itself out to others as a continuation of the predecessor corporation. As in Comstock, however, the court does not explain the relative weight to be given the various factors.
 
 
 28
 Finally, in Avery, the case which the parties claim is the most relevant case to this appeal, the Kansas Supreme Court did not specify particular factors, but simply held that one company was a continuation of another company when the "entire assets, including [the] municipal licenses, office equipment and goodwill" of the predecessor company were "taken over" by the successor company, and where "[t]he personnel of the stockholders, directors and officers, with a single exception, was identical in the two companies." Avery, 80 P.2d at 1100. No formal dissolution of the predecessor company occurred; rather it dissolved "by the simple expedient of not filing its annual report to the secretary of state," thereby causing automatic forfeiture of its corporate charter. Id. Similarly, there was no formal transfer of assets; the successor company simply took them over. The court held that the general rule of successor nonliability "cannot be applied when the negotiators for both corporations are the same or virtually the same, and the transfer of assets is made merely for their own convenience and advantage." Id. at 1102. In that situation, the court held, "the net result is in legal effect a fraud." Id. at 1101.[2]
 
 
 29
 Applying those various statements to the particular facts of this case, we must affirm the district court's finding that Interchem was a mere continuation of Pyrotech.[3] Here, it is indisputable that there were common shareholders, officers and directors in the two corporations. Further, Pyrotech and Interchem had "direct dealings"--indeed, the common shareholders, officers and directors orchestrated the reverse takeover. Although the transaction was accomplished through an intermediary, PHC, that fact does not alter the fundamental nature of the transaction as a stock exchange agreement between Pyrotech and Interchem, with the officers, directors and key employees of Pyrotech becoming the same officers, directors and key employees of Interchem. While Pyrotech did not dissolve after the transaction with Interchem, the record supports the district court's finding that it became essentially inactive, whereas Interchem became active. Moreover, Interchem does not dispute the district court's finding that Interchem twice publicly held itself out to be the owner of a former Pyrotech project, and there is evidence supporting the district court's finding that Interchem entered into the same general type of business as Pyrotech had. And while Interchem doggedly insists that no assets were transferred from Pyrotech to Interchem, there can be little dispute that all business activity, including all business plans and strategies, transferred from Pyrotech to Interchem, and therefore some assets, if assets can be defined broadly to include, for example, business expertise and plans, employment contracts, trade secrets, and rights to projects, were in fact transferred.
 
 
 30
 Furthermore, the district court found that fraud occurred. "Factual findings on fraud claims are reviewed for clear error." Pacific & Arctic Ry. & Navigation Co. v. United Transp. Union, 952 F.2d 1144, 1147 (9th Cir.1991). As the district court held:
 
 
 31
 Pyrotech entered into the share exchange agreement about a month after signing the letter of intent with plaintiffs, but did not inform plaintiffs. Lee Derr, president of Pyrotech and Interchem, testified that the Pyrotech shareholders were getting restless, and the reverse takeover was designed to provide them some immediate return on their investment. But by this time, Pyrotech was contractually obliged to reimburse plaintiffs for their costs of investigating the project.... [T]he net result was in legal effect a fraud. The plaintiffs negotiated in good faith while Pyrotech and its principals secretly created an intricate web of self-dealing to create a business successor for Pyrotech. As Derr testified, this was designed to give the investors a return on their investment, not in and of itself improper, but clearly so if done at plaintiffs' expense.
 
 
 32
 Moore, 1992 U.S. Dist. LEXIS 6425 at * 6-7. In making those findings, the district court was able to observe the testimony and demeanor of witnesses, and assess their credibility. Interchem has not demonstrated why those findings are clearly erroneous, and, indeed, we find them supported by the record. Those findings themselves compel the conclusion that liability may be imposed on Interchem, inasmuch as it is well-established that liability as a continuation or successor corporation may be imposed if the transaction creating the successor is entered into fraudulently to evade liability. Kansas cases finding successor liability have found fraud, see Avery, 80 P.2d at 1101, whereas those finding no liability have generally specifically indicated there was no fraud. See Stratton, 676 P.2d at 1299; Comstock, 496 P.2d at 1312.
 
 
 33
 In sum, finding neither an error of law nor clear error of fact, we hold that the district court did not abuse its discretion in holding that Interchem was the successor to Pyrotech and therefore liable for the judgment against Pyrotech and Coastal.
 
 
 34
 AFFIRMED.
 
 
 
 [1]
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir. R. 36.3
 
 
 [2]
 Kansas law seems to be in accord generally with most other jurisdictions employing a continuation of business doctrine, including its vagueness as to the weight to be given each factor and whether all factors or merely some of them must be present:
 The traditional indications of "continuation" are: common officers, directors, and stockholders; and only one corporation in existence after the completion of the sale of assets. While the two foregoing factors are traditionally indications of a continuing corporation, neither is essential.... Other factors such as continuation of the seller's business practices and policies and the sufficiency of consideration running to the seller corporation in light of the assets being sold may also be considered.... Thus, the underlying theory of the exception is that, if a corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability.
 
 
 [15]
 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations 7124.10 (perm. ed. rev. vol.1990) (footnotes omitted)
 
 
 [3]
 The district court correctly divined the relevant factors from the cases:
 the extent of assets transferred and the sufficiency of consideration given; the business activities of the new corporation; the identity of the stockholders, officers, or directors; whether the transferor corporation survives the exchange; retention of the same employees, supervisory personnel, production facilities, physical location or name; production of the same product; continuity of assets and general business operations; and whether the second corporation holds itself out to be a continuation of the first.
 Moore, 1992 U.S. Dist. LEXIS 6425 at * 3.