**PACIFIC & ARCTIC RAILWAY AND NAVIGATION COMPANY, Plaintiff-Appellee,**

v.

**UNITED TRANSPORTATION UNION, Defendant-Appellant.**

No. 90–35646.

United States Court of Appeals, Ninth Circuit.

Submitted Dec. 19, 1991.[*]

Decided Dec. 30, 1991.

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Richard K. Walker, Bruce L. Downey and Peter Kryn Dykema, Winston & Strawn, Washington, D.C., James T. Robinson, Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for plaintiff-appellee.

Eric R. Hoffman, Binn, Hochman & Melamed, Mayfield Heights, Ohio, A. Lee Petersen, Anchorage, Alaska, for defendant-appellant.

Before WRIGHT, Senior Circuit Judge, SNEED and SCHROEDER, Circuit Judges.

SNEED, Circuit Judge:

This appeal concerns a labor dispute and arbitration that began nearly a decade ago when the railroad suspended its railway operation between Skagway, Alaska and Lake Bennett, Yukon Territory. Several grievances were heard by a three-member arbitration panel. The union prevailed on the grievances relevant here. The railroad sued to vacate the awards, alleging that the third member of the panel, the supposedly neutral arbitrator, was biased. The district court held for the railroad, finding

a due process violation. This court remanded in an earlier appeal, 855 F.2d 862, directing the district court to address the statutory grounds for vacatur. The district court did so, and again vacated the award. Specifically, the district court found that the award was procured by fraud, that the award exceeded the arbitrator's jurisdiction, and that the arbitrator's bias violated due process. The union appeals these findings. We affirm, on the basis that the award was procured by fraud. We do not reach the other issues addressed by the district court.

## I.

### FACTS AND PROCEEDINGS BELOW

In the fall of 1982, after Pacific and Arctic Railway and Navigation Company suspended its rail operations, United Transportation Union filed several grievances for its members who were out of work. The grievances were submitted to a three-person arbitration board consisting of J.W. Mills from the railroad, Kenneth Levin from the union, and Arthur Sempliner, a supposedly neutral arbitrator. Unknown to the railroad, Levin and Sempliner had been friends for 20 years. Also unknown to the railroad, Levin telephoned Sempliner a number of times before the hearings. The calls followed by less than 24 hours a Canadian panel's issuance of decisions in a closely related case. Levin said the calls were to schedule the hearing, even though an earlier written agreement had already set the date.

The hearing took place on December 14 and 15, 1982, in Seattle, Washington. During the first day of the hearing, Mills asked Sempliner to dinner. Mills planned to ask Levin to join them if Sempliner accepted. Sempliner declined the invitation. He did not mention having made other plans with Levin.

After the close of proceedings on the first day, Levin and Sempliner spent ten to twenty minutes in Sempliner's hotel room. Railroad representatives unexpectedly crossed paths with them as they were leaving the room headed for dinner. The railroad's attorney, James Robinson, testified that he was "dumbfounded" to see them together. He directed Mills to join them, but Levin and Sempliner had left by a side door, and Mills was unable to locate them. Levin and Sempliner had dinner together. Levin paid for the dinner.

The next morning, Levin and Sempliner were seen together again at breakfast. When the hearing reconvened, the railroad objected to the ex parte contacts between Levin and Sempliner, and requested an explanation. Sempliner grew angry and hostile. A heated exchange developed between Sempliner and the railroad's attorney, Robinson. Sempliner repeatedly interrupted Robinson's statements. He characterized the railroad's allegations of impropriety as "drivel," and stated that the railroad had "no right to know" about Levin and Sempliner's activities together. Subsequently, Levin was sworn as a witness. He began to rebut the railroad's allegations. After further exchanges between Sempliner, the "neutral," and Robinson, Sempliner finally told Robinson, "[Y]ou can make no further record."[1] At this point, the railroad withdrew from the hearing.

After a brief recess, Sempliner continued the proceedings with just the union present. The union presented its case through Levin. Levin introduced a number of exhibits into evidence. At one point, Levin began to introduce a document. Sempliner, no longer even in appearance "neutral," instructed the reporter to go off the record and then, believing himself to be off the record, advised Levin that the railroad could require any document intro-

---

1. The exchange that included this statement proceeded as follows:

 THE ARBITRATOR [SEMPLINER]: Sir, I don't care what your plans are. Now, will you stop interrupting the board? If you say you're through, you're through.

 MR. ROBINSON: I'm making a record. Are you preventing me from making a record?

 THE ARBITRATOR: No, you can make no further record.

 MR. ROBINSON: I can make no further record?

 THE ARBITRATOR: As far as I'm concerned, you've said everything you can say.

duced at the hearing to be produced in subsequent litigation. Sempliner then repeated his instruction to go off the record. When the record resumed, Levin introduced only a single page of the document. Toward the close of the hearing, Sempliner twice announced that the matter was heard and submitted, only to reopen the record for additional statements from Levin and himself.

Sempliner ruled in favor of the union. This ruling included an interpretation of a certain disputed clause in the collective bargaining agreement. The railroad asserted that this clause was operative only in case of a permanent shutdown of operations, while the union asserted that either a permanent or a temporary shutdown would trigger the clause. Sempliner accepted the railroad's reading of the clause, but ruled that the railroad had failed to prove its 1982 shutdown was not permanent. Thus, he found that the clause was operative and worked to the benefit of the union. This ruling was made despite the fact that both the railroad and the union agreed the suspension of operations was intended to be temporary, and an explicit disclaimer by the union that the shutdown was permanent. Early in 1983, the railroad sued to vacate Sempliner's awards.

The public law board held a second hearing in Skagway in the fall of 1983 to deal with another grievance. The railroad took the position that it had withdrawn from the public law board, and refused to participate in the hearing. Before the hearing, Levin telephoned Sempliner several times. Although the two arrived together in Skagway, Levin testified they had met accidentally at the airport in Juneau. The hearing lasted perhaps an hour, and no record was kept. Levin and Sempliner remained in Skagway for several days thereafter, during which time they went on fishing trips and took meals together. Sempliner again ruled for the union.

As stated above, this is the second time this case has been before us. This time the union appeals the district court's findings that Sempliner's actions were the functional equivalent of fraud, that his award exceeded the board's jurisdiction, and that his

bias violated due process. We have jurisdiction under 28 U.S.C. § 1291.

## II.

### STANDARDS OF REVIEW

 Review of an arbitration award under the RLA is " 'among the narrowest known to the law.' " *International Ass'n of Machinists & Aerospace Workers v. Southern Pac. Transp.*, 626 F.2d 715, 717 (9th Cir.1980) (quoting *Diamond v. Terminal Ry. Ala. State Docks*, 421 F.2d 228, 233 (5th Cir.1970)). Judicial review of such awards is limited to whether (1) the board failed to comply with the Act, (2) the board failed to confine itself to matters within its jurisdiction, and (3) the board or parties used fraud or corruption to obtain the award. *Union Pac. R.R. v. Sheehan*, 439 U.S. 89, 93, 99 S.Ct. 399, 401, 58 L.Ed.2d 354 (1978); 45 U.S.C. § 153 First (q). The standard of review we employ is whether the award was obtained by fraud.

 We review de novo whether the district court applied the correct test for fraud. *See Toyota of Berkeley v. Automobile Salesmen's Union*, 834 F.2d 751, 755 (9th Cir.1987), *cert. denied*, 486 U.S. 1043, 108 S.Ct. 2036, 100 L.Ed.2d 620 (1988). Factual findings on fraud claims are reviewed for clear error. *Northwest Acceptance Corp. v. Lynnwood Equip.*, 841 F.2d 918, 922 (9th Cir.1988); *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 619 (9th Cir.1981).

## III.

### ANALYSIS

A. *Definition of Fraud*

The RLA does not define fraud. Nor have the courts determined what constitutes fraud under § 153 First (q). At common law, fraud was established if the plaintiff proved that "the defendant made false representations of material fact, intended to induce plaintiff to act, the representations were made with knowledge of, or reckless disregard for, their falsity, and the plaintiff justifiably relied upon those false representations to [its] detriment." *Bulgo v. Munoz*, 853 F.2d 710, 716 (9th Cir.1988).

In reviewing for fraud under § 153 First (q), one court listed bribery as an example of the kind of fraud that this provision was aimed at preventing. *Pitts v. National R.R. Passenger Corp.*, 603 F.Supp. 1509, 1517 (N.D.Ill.1985).

■ Both the Federal Arbitration Act, 9 U.S.C. § 10(a), and Federal Rule of Civil Procedure 60(b)(3) require that fraud be proven by clear and convincing evidence, not be discoverable by due diligence before or during the proceeding, and be materially related to the submitted issue. *LaFarge Conseil et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.*, 791 F.2d 1334, 1339 (9th Cir.1986); *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir. 1988); *see also Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293, 1297 (9th Cir.) (obtaining an award through perjury is fraud), *cert. denied*, 459 U.S. 990, 103 S.Ct. 346, 74 L.Ed.2d 386 (1982). An appearance of impropriety is not sufficient to establish bias under the Arbitration Act. *Toyota of Berkeley*, 834 F.2d at 755.

■ The union argues that because of the strong federal policy favoring arbitration, fraud under § 153 First (q) should require "an extremely high degree of improper conduct," such as dishonesty. We agree and adopt as the test for fraud the common law definition as modified by the Arbitration Act. That Act modifies the common law by requiring a greater level of improper conduct. We believe this is required because of the limited power of review we have over arbitration awards under the RLA.

■ Fraud properly embraces a situation in which the supposedly neutral arbitrator exhibits a complete unwillingness to respond, and indifference, to any evidence or argument in support of one of the parties' positions. *See Pitts*, 603 F.Supp. at 1517 (where one party bribes the supposedly neutral arbitrator, "no matter what the other party argues he is doomed to lose because the case is not being decided on its merits."). As we discuss below, Sempliner's conduct easily fits within that definition.

## B. *Applying the Definition*

■ The union insists that fraud is not a proper characterization. It justifies Sempliner and Levin's ex parte contacts by asserting that arbitration is an informal process in which strict courtroom rules do not apply. It contends that Sempliner's relationship with Levin was not improper and that there was no evidence that the two men discussed the matter they were arbitrating.

The union's position cannot be reconciled with the district court's findings of fact. In particular, the court initially found that "there can be considerable question[ ] as to whether Sempliner retained any degree of impartiality. He was actively taking the union's part and shaping the record in order to sustain any award he intended to make." On remand, the court further found that

> [i]n light of the entire record, including the procedural improprieties; the egregious non-disclosures and unbelievable *post facto* explanations by Levin and Sempliner; Sempliner's assumption of an advocate's role and active assistance to the union in shaping the record so that it might support his awards; the numerous *ex parte* communications between Levin and Sempliner; Sempliner's acceptance of gratuities and other favors from Levin or union officials; the actual and demonstrated bias of Sempliner and the irrational awards that are the product [of] Sempliner's bias and favoritism, I conclude that the awards are tainted by the functional equivalent of fraud....

■ As one would expect, no direct proof exists that Levin talked to Sempliner about the merits of the case. Levin, however, did admit that he and Sempliner had talked about one of the union negotiators, whose post-bargaining report the union used as evidence to show that the agreement included lifetime employment. In addition, the district court did not believe Levin's explanations for the prehearing phone calls with Sempliner. Nor did it believe that Levin and Sempliner had been completely candid about their contacts and conversations. As an appellate court, we defer to such credibility judgments.

*Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). The court's rejection of Levin's testimony, especially when neither he nor Sempliner mentioned any of their connections or contacts until they were confronted by railroad representatives, was not clear error.

Even if Levin and Sempliner did not discuss the merits of the case, their ex parte contacts afforded Levin an opportunity to probe Sempliner's mood and general attitude and then to prejudice Sempliner. The court found that Sempliner revealed his prejudice when he interrupted Levin at the hearing and recommended that Levin offer only a part of a document into evidence. Although the union asserts that the railroad could have introduced the entire document had it remained at the hearing, and contends that the incident was immaterial because the rest of the document was irrelevant to the issues at hand, the district court could properly find that Sempliner's recommendation was driven by his concern about the document's impact should the award be challenged in court.

The district court rejected the union's argument that, inasmuch as arbitration is an informal process where ex parte contacts are common and acceptable, any "procedural improprieties" in the instant case were permissible. The court found that although arbitration is usually informal, the railroad and the union had a practice of conducting more formal hearings. It based this finding on testimony of another neutral arbitrator who had presided over previous railroad and union grievance hearings. Of course, the railroad's expectations do not fix the bounds of acceptable conduct for arbitrators. Nor do we decide how informal an arbitration proceeding properly may be. But the district court could properly find, as it did, that Levin and Sempliner's conduct went far beyond mere informality.

Moreover, the district court found that Sempliner totally disregarded the railroad's arguments in arriving at his decision. As pointed out above, such conduct is, as a matter of law, fraud. While the breakdown of the arbitration proceedings on the second day of the Seattle hearing could simply have been a product of heated tempers and the parties' conflicting expectations of proper conduct, the district court found otherwise. We cannot say its finding was clearly erroneous.

" 'Congress specifically intended in the RLA to keep railroad labor disputes *out of the courts.*' " *Edelman v. Western Airlines, Inc.,* 892 F.2d 839, 843 (9th Cir.1989) (citation omitted). The RLA's statutory scheme facilitates labor arbitration awards by discouraging appeals. However, neither the law nor sound principles of labor arbitration require that fraud be insulated from judicial review. The case before us is one of the very rare cases in which judicial review is warranted. We hold that the conduct of Sempliner and Levin was fraud for purposes of RLA § 153 First (q).

## IV.

## CONCLUSION

The portion of the district court's order directing that the arbitration award be vacated due to fraud is affirmed. We do not reach the other issues addressed by the district court.

AFFIRMED.