**DULUTH MISSABE & IRON RANGE RAILWAY COMPANY, INC.,**
Plaintiff,

v.

**BROTHERHOOD OF LOCOMOTIVE ENGINEERS, Defendant.**

**No. Civ. 99–467 RHK/RLE.**

United States District Court,
D. Minnesota.

Aug. 31, 2000.

See also 866 F.Supp. 420.

## *ORDER*

KYLE, District Judge.

On August 7, 2000 Magistrate Judge Raymond L. Erickson filed his Report and Recommendation (R & R) in this matter and recommended that Plaintiff's Motion to Vacate and Set Aside Award No. 2 of Public Law Board 5764 be granted. Objections have been filed by Defendant and by Plaintiff. Plaintiff's Objections are limited in scope-urging this Court to uphold the proposed disposition of the case-but seeking a review of Judge Erickson's rejection of an alternative ground for vacating the award advocated by Plaintiff.

This Court has conducted the required de novo review of the objected to portions of the R & R; that review has included the briefs submitted to Judge Erickson as well as the Objections themselves submitted to the undersigned. Judge Erickson's R & R is thorough, well reasoned and fully supported by applicable legal principles and will be adopted by this Court.[1]

Upon all of the files, records and proceedings herein, including a de novo review of the objected to portions of the R & R, **IT IS ORDERED:**

1. With respect to Plaintiff's objection to footnote 4 of the R & R, the Court concurs with

1. Defendant's Objections to the Report and Recommendation (Doc. No. 37) are **OVERRULED;**

2. Plaintiff's Objections to the Magistrate Judge's Report and Recommendation (Doc. No. 38) are **OVERRULED;**

3. The Report and Recommendation (Doc. No. 36) is **ADOPTED;**

4. Defendant's Motion for Summary Judgment (Doc. No. 11) is **DENIED;**

5. Plaintiff's Motion for Summary Judgment (Doc. No. 19) is **GRANTED IN PART and DENIED IN PART;**

6. Plaintiff's Motion to Vacate and Set Aside Award No. 2 of Public Law Board 5764 (Doc. No. 19) is **GRANTED;** and

7. Award No. 2 of Public Law Board 5764 is **VACATED AND SET ASIDE.**

**LET JUDGEMENT BE ENTERED ACCORDINGLY.**

## REPORT AND RECOMMENDATION

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(B), upon what are, in effect, cross-Motions for Summary Judgment. The Plaintiff Duluth, Missabe and Iron Range Railway Company ("DM & IR"), seeks to vacate an Arbitration Award, that the Defendant Brotherhood of Locomotive Engineers ("BLE") asks us to confirm.

A Hearing on the Motions was conducted on March 14, 2000, at which time the DM & IR appeared by Patricia A. Burke, and Jeffery S. Berlin, Esqs., and the "BLE" appeared by Richard A. Williams, Jr., and Harold A. Ross, Esqs.

1. Judge Erickson's analysis.

For reasons which follow, we recommend that the DM & IR's Motion for Summary Judgment be granted, and that the BLE's Motion be denied, thereby, vacating the Arbitration Award in dispute.

II. *Factual and Procedural History*

The DM & IR and the BLE have had a long history of negotiating local labor agreements between themselves, as opposed to participating in national collective bargaining agreements between carriers, such as the DM & IR, and individual labor unions, such as the BLE. This course of conduct changed in 1986, when the DM & IR and the BLE participated in national labor negotiations under the auspices of the Railway Labor Act ("RLA"), Title 45 U.S.C. § 151 *et seq.*

Prior to its participation in the national collective bargaining agreement, the DM & IR had an undisputed history of compensating its employees, who were members of the BLE, on the basis of both time worked and mileage covered. Apparently, because the DM & IR is "short haul" railway, its formulation of the interplay, between the hours worked by a given engineer and the miles that engineer traveled in a given day, so as to determine the amount of overtime to be awarded, was unique in comparison to larger carriers. Under the parties' long past practice, an engineer would be paid for a "basic day," during which he or she traveled a contractually determined number of miles in a day. According to the parties' past practice, a "basic day" consisted of 130 miles. A basic day, however, could potentially be completed in less than eight hours.

On the other hand, depending on the number of stops, which were made by the engineer during the day, as well as the length of terminal and other delays, it could take longer than eight hours to travel 130 miles. As a result, an engineer who traveled more than 130 miles received "overmiles" pay for those additional miles. To avoid the potential, that an engineer would receive both overtime, and overmiles pay—a situation which the DM & IR characterizes as "duplicate premium pay"—"the number of hours the engineer had to be on duty before receiving time-based overtime pay increased in direct proportion [to overmiles traveled] ***." *DM & IR's Memorandum in Support*, at 3.

Consistent with the past practices of the parties, engineers were paid an amount which was determined by dividing the engineer's total miles run by 16.5, which is the number obtained by dividing the basic day of 130 miles by 8 hours. *Id.* Thus, if an engineer traveled 165 miles in a day, he would not receive overtime pay until he had worked 10 hours (165 ÷16.5 = 10). *Declaration of Lawrence M. Riley* ¶¶ 8–9. This, however, would not end the calculation.

Again, because the DM & IR is a short-haul railroad, its engineers typically make shorter runs than do engineers on other railroads. As a result, if based solely upon the total miles run in a day, the DM & IR's engineers would make less than their counterparts on long-haul railroads. This is true, apparently, because of the greater amount of time spent at terminals, on short haul routes, and the correspondingly smaller amount of time expended in track runs. Accordingly, since 1923, the DM & IR's agreements with the BLE provided that engineers' pay would be calculated on the basis of miles traveled, which included not only miles actually run, but also "constructive" miles that were awarded to the engineer. *DM & IR's Memorandum in Support*, at 4. "Constructive miles run" results from a computation which takes into account the amount of time that an engineer on the DM & IR would have to spend at various terminals along his or her route. *Riley Decl.* ¶ 10. Thus, the DM & IR paid its engineers on the basis of the following formula: actual miles run plus earned constructive miles, divided by 16.25 which, the DM & IR advises, was the divisor that was applied in 2000.

Both parties are in agreement that this formula, which was incorporated in their Local Agreements as "Rule 7," was in effect prior to 1986, and that it was routinely applied by the parties, even in the years following the inception of the National Agreement, between 1986 and 1994, when for the first time, the BLE challenged the reimbursement of overtime hours, and miles paid, as being in conflict with the provisions of the 1986 National Agreement.

In 1986, the DM & IR joined other railroad carriers in participating in national labor negotiations with the BLE. The negotiations, by every appearance, were both long, and arduous. After the membership of the BLE refused to ratify a "tentative agreement," the parties to the negotiations executed an Agreement, on April 15, 1986, to submit the differences, in their proposed contract terms, to binding arbitration under the RLA. *Verified Complaint, Attachment A.* Their Arbitration Agreement established both the constituency, and the jurisdiction, of Arbitration Board No. 458. *Id., Sections Third through Sixth, and Eighth.* As "Section Nineteenth" to that Arbitration Agreement, the parties agreed as follows:

> This Agreement (together with Exhibits A, B, C, D, and E affixed hereto) embodies the entire agreement and understanding between the parties and supercedes [sic] all prior agreements and understandings relevant to the subject matter hereof. No amendments, waivers, or modifications to this Agreement are to be effective unless executed by the parties' duly accredited representatives in a writing referring to this Agreement.

*Id., Section Nineteenth.*

Arbitration Board No. 458 ruled that the parties' "tentative agreement" was a proper means of resolving most of their disputes, and then went on to dispose of a handful of other differences. By our reading, the provisions of the "tentative agreement," which related to overtime pay as

pertinent here, were not the subject of any individualized treatment by Arbitration Board No. 458.

The 1986 Agreement, which was imposed upon the parties by Arbitration Board No. 458, applies a differently worded formula, than that employed in the pre-1986 agreements between DM & IR and the BLE, in order to arrive at overtime and overmile pay. Article IV, Section 2(c), of the 1986 Agreement, provides as follows:

> The number of hours that must lapse before overtime begins on a trip in through freight or through passenger service is calculated by dividing the miles of the trip or the number of miles encompassed in a basic day in that class of service, whichever is greater, by the appropriate overtime divisor. Thus after June 30, 1988, overtime will begin on a trip of 125 miles in through freight service after $125/13.5 = 9.26$ hours or 9 hours and 16 minutes. In through freight service, overtime will not be paid prior to the completion of 8 hours of service.

*Award of Arbitration Board No. 458, Article IV, Section (2)(c), Appendix B (National Agreement), Declaration of Joseph A. Cassidy, Jr., Exhibit 1.*

Commencing in 1994—some eight years after the 1986 Agreement—the BLE began to grieve the DM & IR's disallowance of the overtime pay computations of various BLE members. According to the BLE, the provisions of the 1986 Agreement superseded those of Rule 7, and allowed a computation of overtime, which was predicated on "miles run," as opposed to "miles paid," and which was, therefore, more favorable to the BLE than was Rule 7.

The details of the parties' respective contractual arguments are not critical to the issue we must resolve but, suffice it to say, the pivotal issue, which separated the parties, was whether the 1986 Agreement trumped Rule 7. Being unable to amicably

dispose of the issue, the parties entered an Agreement, on June 15, 1995, to submit their differences to arbitration under the RLA. In due course, Public Law Board ("PLB") 5764 was created to arbitrate a resolve. As part of their Arbitration Agreement, the parties expressly agreed, as follows:

> The Board shall not have jurisdiction of disputes growing out of requests for changes in rates of pay, rules or working conditions nor have any authority to change existing agreements or establish new rules.

*Cassidy Declaration, Exhibit 3,* at p. 1.

PLB 5764 was composed of three members—a representative of the BLE, a representative of the DM & IR, and a neutral Arbitrator, who was appointed by the National Mediation Board. After a Hearing, at which evidence and written submissions were tendered by the parties, PLB 5764 issued an Award on September 26, 1997, which sustained the BLE's grievances, and which determined that Rule 7, of the parties' Local Agreement, had been superseded by Article IV of the 1986 National Agreement. In so deciding, PLB 5764 concluded that the phrase "miles of the trip," as contained in Article IV of the 1986 Agreement, unambiguously meant "miles run," and not "miles paid." The DM & IR's representative on PLB 5764 dissented.

In seeking to vacate the Arbitration Award, the DM & IR contends that the Board—and, specifically, the neutral Arbitrator and the BLE's representative—exceeded their jurisdiction, by relying upon a purported contractual provision, so as to allow Rule 7 to be superseded, which was inapplicable to the parties' dispute. Further, the DM & IR contends that the BLE's representative engaged in fraud, or corruption, in inducing the neutral Arbitrator to believe that the offensive contractual provision was applicable. In turn, the BLE argues that, while the neutral Arbitrator may have erred, in relying upon contractual language that finds no place in

the 1986 Agreement, the error was harmless, at worst, and was inadvertent, rather than some fraudulent scheme on the BLE's part. In addition, the BLE argues that this Court is without jurisdiction to resolve this dispute, as the DM & IR paid the amount due, under the Award in PLB 5764, and because the DM & IR was untimely in its commencement of this action.

### III. *Discussion*

A. *Standard of Review.* Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. *Hunt v. Cromartie,* 526 U.S. 541, 548, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Carter v. St. Louis Univ.,* 167 F.3d 398, 400 (8th Cir.1999); *Prudential Ins. Co. v. National Park Med. Center, Inc.,* 154 F.3d 812, 818 (8th Cir.1998). For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a verdict for the nonmoving party. See, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Liebe v. Norton,* 157 F.3d 574, 578 (8th Cir.1998); *Dodd v. Runyon,* 114 F.3d 726, 729 (8th Cir.1997).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as other-

wise provided in *** Rule [56], must set forth specific facts showing that there is a genuine issue for trial." *Rule 56(e), Federal Rules of Civil Procedure; Lambert v. City of Dumas,* 187 F.3d 931, 934 (8th Cir.1999); see, *Herring v. Canada Life Assur. Co.,* 207 F.3d 1026, 1029 (8th Cir. 2000) ("opponent must do more than simply show that there is some metaphysical doubt as to the material facts.").

Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999), quoting, *Celotex Corp. v. Catrett,* supra at 322, 106 S.Ct. 2548; see also, *Greer v. Shoop,* 141 F.3d 824, 826 (8th Cir.1998); *Mayard v. Hopwood,* 105 F.3d 1226, 1228 (8th Cir.1997). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* supra at 323, 106 S.Ct. 2548; see also, *Brower v. Runyon,* 178 F.3d 1002 (8th Cir. 1999); *Bell Lumber and Pole Co. v. United States Fire Ins. Co.,* 60 F.3d 437, 441 (8th Cir.1995); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 510 (8th Cir.1995); *Settle v. Ross,* 992 F.2d 162, 163 (8th Cir.1993).

B. *Legal Analysis.* We are here asked, by both parties, to decide, purely on legal grounds, whether the Award in PLB 5764 should be confirmed, or vacated. As such, the parties acknowledge that there are no genuine issues of material fact, and that one of the parties is legally entitled to Judgment as a matter of law. As a result, we address the standard which governs our analysis, and then proceed to an assessment of the merits of the parties' respective claims.

■ 1. *Standard of Review.* Our review of an arbitration award, under the RLA, is statutorily limited. Unless the Award is affected by a failure to comply with the requisites of the RLA, by a failure to conform, or confine itself, to matters within the scope of the Board's jurisdiction, or by fraud or corruption by a member of the Board, the findings and order of the Board shall be "conclusive on the parties." *Title 45 U.S.C. § 153, First (p); see* also, *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 304, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989); *Schiltz v. Burlington Northern R.R.,* 115 F.3d 1407, 1414 (8th Cir.1997) (power of Court to review arbitration award of the National Railroad Adjustment Board ("NRAB") is among the narrowest known to the law); *Union Pacific Railroad Co. v. United Transportation Union,* 3 F.3d 255, 258 (8th Cir.1993) (scope of review of NRAB's award is "among the narrowest known to the law"), cert. denied, 510 U.S. 1072, 114 S.Ct. 881, 127 L.Ed.2d 76 (1994), quoting *International Ass'n of Machinists v. Northwest Airlines,* 858 F.2d 427, 429 (8th Cir.1988).

■ Arbitration Boards, which are created pursuant to Section 3 Second of the Act, *Title 45 U.S.C. § 153 Second,* are subject to the same procedures as are applicable to the NRAB. See, *Bhd. of Locomotive Engineers v. Union Pacific R.R.,* 134 F.3d 1325, 1330 (8th Cir.1998); *Bhd. of Ry., Airline and Steamship Clerks v. St. Louis Southwestern Ry.,* 676 F.2d 132, 135 n. 2 (5th Cir.1982). Moreover, the jurisdiction of the PLB is coextensive with that of the NRAB. *Brotherhood of Railroad Trainmen v. Chicago River and Indiana R.R. Co.,* 353 U.S. 30, 36 n. 13, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); *Taylor v. Missouri Pacific R .R. Co.,* 794 F.2d 1082, 1084 (5th Cir.1986), cert. denied, 479 U.S. 1018, 107 S.Ct. 670, 93 L.Ed.2d 721, 722 (1986).

■ 2. *Legal Analysis.* We accept, as do the parties, that the issue presented is a narrow one of jurisdiction, and does not invoke the plenary review of this Court.

As the BLE underscores, the Award in PLB 5764 is not susceptible to vacation, merely because we may think it wrong, or because we could have decided the matter differently. See, *PaineWebber, Inc. v. Agron*, 49 F.3d 347, 350 (8th Cir.1995) ("We are not entitled to merely substitute our judgment for that of the arbitration panel, no matter how wrong we believe the panel's decision to be."). As a consequence, we have purposefully avoided a detailed recitation of the parties' factual proofs, as to the proper means of computing overtime pay, and we express no view on an issue that is properly subject either to the parties' contractual negotiations, or to an arbitral resolve under the RLA. Instead, our singular focus is riveted to determining whether PLB 5764 exceeded its jurisdiction, in rendering its Award. Stated in the vernacular of arbitration law,[1] if

---

1. The BLE has asserted that there is no "case or controversy" between the parties, concerning the validity of the Award in dispute. As a result, the BLE contends that we are without jurisdiction to address the legitimacy of PLB 5764's Award. See, *Minnesota Humane Society v. Clark*, 184 F.3d 795, 797 (8th Cir.1999) ("A case that no longer presents a live case or controversy is moot, and a federal court lacks jurisdiction to hear the action"), citing *Hickman v. Missouri*, 144 F.3d 1141, 1142 (8th Cir.1998). This is so, the BLE argues, because the DM & IR satisfied the Award by entering into a settlement agreement, in January of 1998, under which each claim, that was resolved by that Award, was paid. *BLE's Memorandum in Support*, at 10–11.

   In opposition to this assertion, the DM & IR represents that it has not entered into any such "settlement agreement," and that, in fact, the letter relied upon by the BLE, as being a settlement agreement, says no more than that the Award in PLB 5764 directed the DM & IR to pay approximately $73,000.00 in claimed overtime. See, *Riley Decl., Ex. 5*. The disputed letter, from R.E Adams of the DM & IR, to R.E. DeLano of the BLE, states, in relevant part, as follows:

   > This is in response to the meeting held between yourself and our office on January 15, 1998, to discuss the settlement of PLB 5764[sic], Award No. 2. It was agreed the following payments would be made: [listing of BLE members and the agreed upon compensation owed to each under the Vernon Award]. If you are in agreement that this will satisfy the terms of the Award No. 2 of PLB 5674[sic] please sign in the space provided.

   *Id.*

   As noted, the parties dispute the import of the subject letter, insofar as it impacts upon our jurisdiction to address the merits of the contested Award. The DM & IR emphasizes that, contrary to the BLE's assertion, that the letter settled the parties' dispute over the computation of overtime pay, the contractual dispute has remained, following the overtime payments made, and the DM & IR continues to calculate overtime pay on the basis of Rule 7, which the BLE has continued to challenge on the basis of PLB 5764's Award. Therefore, the DM & IR maintains that its payment of the Award has done nothing to moot the parties' claims over the legitimacy of the Award. See, *Chrysler Motors Corp. v. International Union, Allied Industrial Workers of America*, 2 F.3d 760, 764 (7th Cir.1993) (company's "willingness to comply with the award did not bar it from arguing on appeal that *** the award was flawed.").

   We reject the BLE's contention that, by agreeing to comply with the terms of PLB 5764's Award, the DM & IR voluntarily waived its right to challenge the Award. See, *Tungseth v. Mutual of Omaha Ins. Co.*, 43 F.3d 406, 409 (8th Cir.1994) ("[P]ayment of a judgment alone does not moot an appeal, as to *** the underlying merits, unless the parties intended to abandon their right to appeal."), citing *Ferrell v. Trailmobile, Inc.*, 223 F.2d 697, 698 (5th Cir.1955) (payment of Judgment in order to prevent foreclosure may not moot appeal from underlying Judgment); *Barnes v. Bosley*, 828 F.2d 1253, 1257 n. 4 (8th Cir.1987) (payment of Judgment of back pay award to stop accrual of interest did not moot issue of propriety of award).

   To the extent that the BLE contends that the DM & IR's letter, which agreed to pay the amounts determined by the Award, constituted the DM & IR's agreement to settle its claims, and to abandon its right to seek judicial review, we note that "[s]ettlement agreements are governed by basic principles of contract law." *MIF Realty L.P. v. Rochester Associates*, 92 F.3d 752, 756 (8th Cir.1996), quoting *Sheng v. Starkey Lab., Inc.*, 53 F.3d 192, 194 (8th Cir.1995). To be enforceable, a settlement agreement must be based upon "a meeting of the minds on the essential terms of the agreement." *Ryan v. Ryan*, 292 Minn. 52, 193 N.W.2d 295, 297 (1971). Here, it is patently clear that nothing in the DM & IR's letter so much as suggests any intent, on the DM & IR's part, to waive its right to a judicial review of the underling merits of the Award. Accordingly, we reject the BLE's contention, that we lack jurisdiction to decide the merits

we conclude that the Award drew its essence from the parties' controlling labor agreement, then we may not upset the result that the PLB reached. Here, however, based upon the entirety of the Record before us, we cannot draw that conclusion and, therefore, the Award must be vacated, and the matter recommitted to the parties for a proper disposition.

■ 1. *The Jurisdictional Issue.* A PLB's award that is "wholly baseless and completely without reason," may be vacated upon judicial review. *Gunther v. San Diego & Arizona Eastern Ry.,* 382 U.S. 257, 261, 86 S.Ct. 368, 15 L.Ed.2d 308 (1965); *Air Line Pilots Ass'n v. Northwest Airlines,* Inc., 498 F.Supp. 613, 620 (D.Minn.1980), citing *Brotherhood of Railway, Airline & Steamship Clerks v. Kansas City Terminal Ry.,* 587 F.2d 903, 906–908 (8th Cir.1978).[2] Thus, a PLB has exceeded its jurisdiction if its decision is without foundation in reason or fact. *International Ass'n of Machinists v. Southern, Pac. Transp.,* 626 F.2d 715, 717 (9th Cir.1980); *Bhd. of R.R. Trainmen v. Central of Georgia Ry. Co.,* 415 F.2d 403, 411 (5th Cir.1969), cert. denied, 396 U.S. 1008, 90 S.Ct. 564, 24 L.Ed.2d 500 (1970). "The requirement that the result of arbitration have 'foundation in reason or fact' means that the award must, in some logical way, be derived from the wording or purpose of the contract." *Id.* (emphasis added); *Beardsly v. Chicago & North Western Transportation Co.,* 850 F.2d 1255, 1270 (8th Cir.1988); *Coca–Cola Bottling Co. v. Teamsters Local Union No. 688,* 959 F.2d 1438, 1442 (8th Cir.1992) (arbitrator has no "authority to alter [an] agreement by interpreting unambiguous language in a way contrary to its plain meaning"). By extension, then, an arbitrator has no authority

of the parties' competing contentions as to the propriety of PLB 5764's Award.

2. The BLE has asserted that this action is untimely because of the DM & IR's delay in its commencement. However, the BLE has offered no specific statute of limitations, which would bar the DM & IR's claim, nor have they articulated any other legal hurdle

to impose upon the parties conditions that are not a part of their agreement, which he has been afforded jurisdiction to interpret.

■ Applying these principles here, the thrust of the DM & IR's challenge to the Award of PLB 5764 is the Award's inclusion of the following reasoning, to conclude that Rule 7 was superseded by the 1986 Agreement:

> It is the opinion of the Board that regardless of the past operation of the locally negotiated Rule 7, it was clearly modified by the nationally negotiated Article IV. The Parties bought into national handling, and they agreed that language agreed to there controlled all related prior agreements. The relevant portion of the agreement [in] this regard read as follows:

> "APPENDIX A", 1986 NATIONAL AGREEMENT Section "NINETEENTH"

> "*NINETEENTH:* This Agreement (together with Exhibits A, B, C, D, and E affixed hereto) embodies the entire agreement and understanding between the parties and supersedes all prior agreements and understandings relevant to the subject matter hereof. No amendments, waivers, or modifications to this Agreement are to be effective unless executed by the parties duly accredited representatives in a *writing* referring to this Agreement.

*Cassidy Declaration, Exhibit 10,* at p. 3.

If Section NINETEENTH had been contained in the 1986 National Agreement, or otherwise bound these parties in the proper disposition of the grievances presented to PLB 5764, then our analysis would be at an end.

which would defeat the DM & IR's commencement of this action, on timeliness grounds. As the parties related, at the time of the Hearing, the issues presented are still actively contested, and are the subject of other arbitration proceedings, that were then pending.

Unfortunately, Section NINETEENTH is a provision that was contained in the previously referenced Arbitration Agreement, which instituted Arbitration Board 458, and its sole legal effect was to insure that the Agreement, which created that Board, was solely operative, unless the parties to **that** arbitration, expressly contracted otherwise. Section NINETEENTH bears no relationship, however tenuous, to the issues presented to PLB 5764.[3] The consideration of that provision, by PLB 5764, was plain, undeniable error. Indisputably, the Award of PLB 5764 makes clear that, in the view of the neutral Arbitrator, and of the BLE representative, Section NINETEENTH was the applicable provision of the 1986 National Agreement, and its provision dispositively determined that Rule 7 "was clearly modified by the nationally negotiated Article IV." *Id.*

Notwithstanding the Award's clear recitation, that the parties had "agreed that language agreed to there [i.e., in the "nationally negotiated Article IV"] controlled all related prior agreements, there was nothing before PLB 5764 which sustained that view, and certainly not "the agreement," that the Award cites for that proposition. Of course, the parties should not be subject to, let alone be bound by, contractual provisions which have no bearing on an arbitral issue presented. Indeed, they expressly denied PLB 5764 jurisdiction "to change existing agreements or establish new rules." See, *Cassidy Declaration, Exhibit 3 [Arbitration Agreement Creating PLB 5764]*, at p. 1. As we have noted, absent the parties' consent, when an arbitrator creates, from whole cloth, contractual provisions which bind the parties to language that they have not negotiated, the arbitrator flatly errs".

While conceding, somewhat reluctantly, that the reliance of PLB 5764 upon Section NINETEENTH was inappropriate, the BLE urges that, if error there be, the error was harmless. They note, correctly, that the reasoning of PLB 5764, which led to its finding, that Rule 7 was superseded by the 1986 National Agreement, did not end with the quoted language of Section NINETEEN. Following the quotation of Section NINETEENTH, the Award goes on to state, as follows:

> The Board would clearly exceed its jurisdiction if it were to conclude that Article IV didn't supersede Rule 7. The Board can not amend the national agreement to make an exception for the D.M. & I.R. Only the parties can rewrite the agreement. A national agreement is a uniform rule to be applied in uniform manner. There is no dispute that the framers of Article IV intended that the numerator in overtime calculations be based on miles run. This is clear. This is unambiguous. A uniform clearly stated national agreement can't be unambiguous for 99.9 percent of railroads and ambiguous for one. The relevant portions of Article IV are simply not subject to interpretation.
>
> Certainly there are individual anomalies that arise when trying to apply a uniform rule on multiple railroads. However, the answer isn't to ask an Arbitrator to modify an agreement. The answer is to negotiate a solution. The Carrier could have opted out of national negotia-

---

3. We read Section NINETEENTH's reference to "Exhibits A, B, C, D, and E," as an attempt, by the parties to **that** Agreement, to limn the domain of the arbitration that would ensue. Exhibit A was a roster of the railroads who were participating in the arbitration, while Exhibits B, C, and D, were the Section 6 Notices of the BLE, which presented additional contractual proposals. Exhibit E was the Section 6 Notice of the participating railroads, which also proffered contractual proposals. Plainly, the parties to the Agreement to Arbitrate, which formed Arbitration Board 458, wanted that Board's attention to be focused on a variety of contractual proposals. It would make no sense to read Section NINETEENTH as binding the arbitrating parties to a series of contractual proposals, which those same parties had rejected during their contract negotiations. Accordingly, there is nothing in Section NINETEENTH that so much as intimates that Rule 7 was superseded by Article IV of the 1986 National Agreement.

tions, or they could have insisted, as often is done, on an elections clause where they had the right to preserve the old rule. This was not done with respect to this Article IV.

Equity may favor the Carrier's position, but that is the grist for the bargaining table. The Board's function is to interpret the Parties national bargain, not alter it to fit individual circumstances. In the face of clear language, past practice is irrelevant. Where a clear right exists, it is difficult to say it cannot be enforced even after a period of non assertion.

*Cassidy Declaration, Exhibit 10,* at p. 3.

Since PLB 5764 recited other reasons for refusing to recognize any continued vitality to Rule 7, after its recitation of Section NINETEENTH, the BLE argues that the Award properly drew its essence from the parties' labor agreements, and that we should merely excise the offending quotation of Section NINETEENTH, and confirm the Award on what remains.

While we can agree that the language of the Award, apart from the reference to Section NINETEENTH, goes to the core issue before PLB 5764, and relates to contractual provisions—either Rule 7, or Article IV—which the parties had contracted, the extractive approach, that the BLE commends, is not surgically sound. We do not here engage in an algebraic formulation, in which unknown values can be ascertained by extrapolation from known values. Rather, in a decisional process, such as that employed by PLB 5764, the unknown values can fatally infect the known values in ways that are neither fixed, nor measurable. If, as is clear, PLB 5764 considered Section NINETEENTH to express the parties' mutual recognition, that the 1986 National Agreement, with its Article IV, "supersede[d] all prior agreements and understandings relevant to the subject matter hereof," then the Award's reference to an absence of jurisdiction to "rewrite" the parties' contractual agreement, makes sense, as does the Award's commendation of a resolve through contractual bargaining.[4]

4. The only other observation, that PLB 5764 has expressed in this aspect of its Award, was a conclusion that the meaning of "miles of the trip," as employed in Article IV, was "clear" and "unambiguous." This conclusion, however, does not weigh in the determination of whether Rule 7 was superseded by Article IV, for it merely reflects the Board's view that the application of such a "clear" and "unambiguous" meaning would be appropriate, if supersession had occurred.

We are mindful of the DM & IR's protest, that PLB 5764 overlooked, or ignored, the DM & IR's argument that the phrase "miles of the trip" was not unambiguous. Specifically, citing the Award's statement that, "[n]otably, there is no dispute that under the national agreement the overtime numerator is the running miles of the trip (miles run)," the DM & IR underscores that it strenuously disputed that such a meaning was appropriate. As a result, the DM & IR maintains that PLB 5764 wholly ignored its position and, thereby, further exceeded the limits of its jurisdiction.

Following the reasoning of PLB 5764, insofar as it is disclosed in the Board's Award, the Board was apparently persuaded that the "agreed-upon question and answer," which followed its quotation of Article IV, disclosed the parties' intent to read "miles of the trip"

as meaning "miles run." Unfortunately, PLB 5764 does not discuss the impact, if any, of the "agreed-upon" answer's opening sentence, that "Article V does not change existing agreements on the payment of mileage." Interpreting the same phrase in Article IV, in a paralleling contract between the DM & IR and the United Transportation Union, PLB 5638 concluded "that the term 'miles of the trip' is ambiguous," and supported that conclusion, in part, by the fact that "Answer 2 begins by stating that Article V does not change existing agreements on the payment of mileage." See, *Cassidy Declaration, Exhibit 9, Carrier's Exhibit F [PLB 5638 Arbitration Award],* at p. 34 of 37. While PLB 5638 is not binding upon PLB 5764, a reading of that Award, together with the DM & IR's arguments before PLB 5764, delineated the DM & IR's belief that, at least as to its operations, Article IV was ambiguous.

Nonetheless, when viewed in totality, PLB 5764's Award fairly recited the conflicting positions of the parties, and accurately detailed the DM & IR's substantive contentions. While the challenged statement may be somewhat overbroad in its expression, we view this as nothing more than a flaw in opinion-writing and, standing alone, this statement does

Where, as here, an arbitral decision is so diminished, by reliance upon a contractual provision which is unquestionably inapposite, the Award may not properly stand. "Although an arbitrator may look to outside sources to aid in interpreting a collective bargaining agreement, he must construe the contract and he may not amend it." *Int'l Paper Co. v. United Paperworkers Int'l Union,* 215 F.3d 815, 817 (8th Cir.2000), citing *Keebler Co. v. Milk Drivers & Dairy Employees Union,* 80 F.3d 284, 288 (8th Cir.1996); see also, *Excel Corp. v. United Food and Com'l Workers Int'l Union,* 102 F.3d 1464, 1468 (8th Cir. 1996) ("The parties agreed to the language and terms of the [Collective Bargaining Agreement] and are bound by them," and "[e]ven when the arbitrator may look to collateral sources to interpret the [Collective Bargaining Agreement], the arbitrator cannot amend the agreement or impose new obligations upon the parties.").

Necessarily, our analysis is closely guided by our Court of Appeals' decision in *Keebler Co. v. Milk Drivers & Dairy Employees Union,* supra, where the arbitrator had misquoted a settlement agreement as imposing obligations upon the parties, which they had not, in fact, agreed upon. In vacating the arbitrator's award, the Court reasoned, as follows:

> In sum, the arbitrator amended the terms of the side agreement, which he found to be clear, by imposing a new obligation upon Keebler to obtain Union agreement prior to transferring certain accounts. The arbitrator based his decision largely on erroneously quoted language from a settlement letter, which settlement letter was actually intended to have no effect on future transfers. Even given our limited role in reviewing arbitration awards, we conclude that the award in the present case must be vacated because the arbitrator's award does not draw its essence from the collective bargaining agreement or the side agreement.

*Id.* at 289; see also, *Northwest Airlines, Inc. v. Air Line Pilots Ass'n,* 530 F.2d 1048, 1049 (D.C.Cir.1976) (vacating an arbitration award, under the RLA, because the award "rest[ed] *** on the removal of a dispositive issue of fact from the board's jurisdiction, based on a nonexistent stipulation between the parties.")

Absent the Award's mistaken reliance upon Section NINETEENTH, there is no other underpinning for the conclusion of PLB 5764, that Rule 7 was displaced by Article IV. The Award's commentary, on the uniform application of a National Agreement, is directly derived from the Board's erroneous belief that the 1986 National Agreement contained a provision—Section NINETEENTH—in which the parties "agreed that the language agreed to there controlled all related prior agreements." Accordingly, in relying upon a nonexistent Section NINETEENTH, the Award in PLB 5764 did not draw its essence from the parties' labor agreement, and it must be vacated as fatally infirm.[5]

not fatally undermine the Award in PLB 5764.

5. Having determined that the Award must be vacated, we need not reach the DM & IR's contention, that "fraud or corruption by a member of the [Board]" *Title 45 U.S.C. § 153 First (g),* warrants that same result. Nonetheless, in the interests of completeness, we do so as an assist to the District Court, should it reach that issue.

We find it anomalous, at best, that the DM & IR would have us infer "fraud," or "corruption," from the simple fact that the BLE representative, on PLB 5764, was not aware of the BLE's mistaken reliance upon Section

NINETEENTH—an awareness which, according to the Record presented, has eluded all of the parties until sometime shortly before the commencement of this action. Despite the fact that the BLE's representative was deposed, and was closely questioned on this claim, the DM & IR offers nothing more than a blend of suspicion, and surmise, to support a claim of fraud and corruption. Such a showing is insufficient. As the Court, in *Goff v. Dakota, Minnesota & Eastern R.R. Corp.,* 2000 WL 783064 at *5, 164 LRRM (BNA) 2557 (D.S.D., March 16, 2000), recently explained:

> The RLA does not define fraud. The Ninth Circuit Court of Appeals in *Pacific & Arctic*

NOW, THEREFORE, It is—

RECOMMENDED:

1. That the Defendant's Motion for Summary Judgment [Docket No. 1] be denied.

2. That the Plaintiff's Motion for Summary Judgment [Docket No. 19] be granted in part, and denied in part, and that its Motion to Vacate and Set Aside Award No. 2 of Public Law Board 5764 [Docket No. 19] be granted.

August 7, 2000.

*Ry. v. United Transp. Union*, 952 F.2d 1144 [139 LRRM 2256] (9th Cir.1991), recognized that fraud was established at common law if it was proved that the alleged fraudulent party made false representations of material fact which were intended to induce the other party to act, that the representations were made with the knowledge of, or reckless disregard for, their falsity and the other party justifiably relied upon these false representations to its detriment. Id. at 1147.

Fraud must be proved by clear and convincing evidence and cannot be discoverable by due diligence before or during the proceeding. *Id.*, Federal Arbitration Act, 9 U.S.C. § 10(a), Federal Rules of Civil Procedure 60(b)(3). A finding of fraud under the RLA demands "a greater level of improper conduct" than the common law level to establish fraud. *Id.* Because of the strong federal policy favoring arbitration, fraud can only be established by clear and convincing proof of extremely high degree of improper conduct such as dishonesty. *Id.* Obtaining an award by perjured testimony constitutes fraud.

The DM & IR has presented no such proof and, therefore, that aspect of its Motion for Summary Judgment should be denied.