**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED TRANSPORTATION UNION; RICHARD D. KITE, *Plaintiffs-Appellants*, <br><br> v. <br><br> BNSF RAILWAY COMPANY, *Defendant-Appellee*. | No. 11-35714 <br><br> D.C. No. 3:10-cv-05808-RBL <br><br><br> OPINION |

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted
July 11, 2012—Seattle, Washington

Filed March 13, 2013

Before: Stephen Reinhardt, Andrew J. Kleinfeld, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Reinhardt

## SUMMARY[*]

### Labor Law

The panel reversed the district court's dismissal of a union's petition for review under the Railway Labor Act of the arbitration decisions of two Public Law Boards concerning a dispute regarding a railway employee's discharge.

The panel held that the district court had subject matter jurisdiction under 45 U.S.C. § 153(q) First, to review the order of the first Public Law Board, which dismissed the case without prejudice after rejecting the union's allegations of fraud and corruption in connection with the recusal of a neutral Board member who had issued a draft decision ordering the employee's reinstatement.

The panel held that the union stated a claim for corruption as to the order of the first Board by alleging that the railway's Board representative had made an economic threat against the neutral member if she did not change the outcome of the draft decision. The union also stated a claim for corruption as to the order of the second Board, which issued a final award in favor of the railway, by alleging that the second Board's neutral member had been made aware of the prior threat. The panel remanded the case to the district court to allow the union to attempt to prove its allegations of corruption by clear and convincing evidence.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Rick Pope and Stephen C. Thompson, Kirklin Thompson & Pope LLP, Portland, Oregon, for Plaintiffs-Appellants.

David M. Pryor and Tamara Buettner Middleton, BNSF Railway Company, Fort Worth, Texas, for Defendant-Appellee.

**OPINION**

REINHARDT, Circuit Judge:

This case concerns allegations of corruption by a representative of the BNSF Railway Company ("Railway") during mandatory arbitration of a dispute relating to the discharge of a Railway employee, Richard Kite, represented by the United Transportation Union ("Union"). In brief, after a special adjustment board heard Kite's case and the neutral member circulated a draft award reinstating him, the Railway representative allegedly threatened the member by stating, "If you are going to issue these kinds of opinions, you will never work for a Class One railroad again." Within two months of the making of the alleged statement by the Railway representative, the neutral member recused herself and issued an order dismissing the case without prejudice. The case was then reassigned to a new board with a new neutral member (but with the same Railway and Union representatives). The new neutral member ruled against Kite and issued a final award in favor of the Railway. The Union filed a Petition for Review in federal district court under the Railway Labor Act, 45 U.S.C. § 153(q) First, arguing that, because the Railway achieved this favorable outcome through corruption, the court

should set aside the award and reinstate the draft award favorable to Kite.

The district court granted the Railway's motion to dismiss on the basis that (1) it lacked jurisdiction over part of the suit, and (2) with respect to the remainder of the suit, the Union had failed to state a claim upon which relief could be granted. Both determinations were incorrect, and we reverse accordingly.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Railway Labor Act

To prevent crippling strikes in the railroad industry, Congress enacted the Railway Labor Act (RLA or Act) in 1926. 44 Stat. 577 (1926). Believing that private settlement would "provide for the prompt disposition of disputes between carriers and their employees," *id.* at 577, Congress designed the RLA to encourage and facilitate private settlement of labor disputes. The Act's first substantive section imposed a duty on both labor and management

> to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

*Id.* at 577–78 (codified at 45 U.S.C. § 152, First); *see also Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377 (1969) (describing this duty as the "heart of the Railway

Labor Act"). While this duty was constant, irrespective of the nature of the dispute, the remainder of the Act differentiated between major and minor disputes. For major disputes—i.e., those disputes relating to the formation of collective bargaining agreements[1]—Sections Four through Ten of the Act outlined "a detailed framework to facilitate the voluntary settlement of major disputes," *id.* at 378. Rather than imposing a mandatory arbitration requirement, Congress created the National Mediation Board (NMB), an independent agency, headed by a three-person panel appointed by the President of the United States. The NMB was assigned the function of inducing the parties to settle, either through mediation, arbitration, or at the behest of an emergency board convened by the President. *Id.* For minor disputes—i.e., those disputes relating to the interpretation or application of existing collective bargaining agreements—Congress created a different but analogous framework favoring voluntary settlement. In Section Three, the Act stated that "[b]oards of adjustment shall be created by agreement between any carrier . . . and its . . . employees." 44 Stat. 577, 578 (1926). The Act further described the role of these boards in adjusting minor disputes, including the authority to impose a "final and binding" decision on the parties. *Id.* at 578.

The 1926 scheme of voluntary arbitration proved ineffectual with respect to minor disputes. Because the adjustment boards were to be created by mutual agreement, and no sanctions existed for failure to create a board, many railroads

---

[1] The major/minor dispute distinction was recognized and explained in *Elgin, J. & E.R. Co. v. Burley*, 325 U.S. 711, 722–24 (1945).

> refused to participate on such boards or so limited their participation that the boards were ineffectual. Moreover, the boards which were created were composed of equal numbers of management and labor representatives and deadlocks over particular cases became commonplace. Since no procedure for breaking such deadlocks was provided, many disputes remained unsettled.

*Union Pac. R.R. Co. v. Price*, 360 U.S. 601, 610 (1959). Because minor grievances were not being resolved in a timely fashion, the railroad industry continued to face the threat of strikes, *id.* at 610–611, the very harm that the RLA was enacted to prevent. The labor organizations

> were particularly dissatisfied. They urged that effective adjustment of grievances could be attained only by amendments to the 1926 Act that would establish a National Adjustment Board in which both carriers and employees would be required to participate, that would permit an employee to compel a carrier to submit a grievance to the Board, that would provide for a neutral person to break deadlocks occurring when the labor and management representatives divided equally, and, finally, that would make awards binding on the parties and enforceable in the courts, when favorable to the employees.

*Id.* at 611. Labor representatives testified before Congress that they were willing to give up their right to litigate minor grievances because they felt that they would achieve "a

measure of justice" under their proposed scheme. *Id.* at 613 (quoting *To Amend the Railway Labor Act: Hearings before the Senate Comm. on Interstate Commerce on S. 3266*, 73d Cong., 2d Sess., at 35 (statement of George Harrison, President of the Brotherhood of Railroad Clerks)).

Congress's 1934 amendments to the RLA closely tracked labor's suggested revisions. Congress replaced the ad hoc adjustment boards with the National Railroad Adjustment Board (NRAB), a board of 36 private persons representing labor and management in equal numbers. 48 Stat. 1185, 1189 (1934).[2] The NRAB was divided into four Divisions, each representing different classes of employees. *Id.* at 1190–91 (codified at § 153(h) First). Under the revised Act, if the carrier and the employee were unable to resolve a minor dispute, it became mandatory that the dispute be resolved by the appropriate division of the NRAB, upon the submission of either party. *Id.* at 1191 (codified at § 153(m) First); *Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320 (1972); *Trainmen v. Chi. River & Ind. R.R. Co.* (*Chicago River*), 353 U.S. 30, 36–39 (1957). If the division deadlocked, a neutral referee would be appointed, chosen either by the NRAB representatives or—if they were unable to agree—by the NMB. 48 Stat. at 1191 (codified at § 153(l) First).

"Having created this body of railroad men to solve disputes within their own field of expertise, Congress then indicated that it did not want the work of the Board to be readily undone by the courts." *Trainmen v. Cent. of Ga. Ry. Co.* (*Central Georgia*), 415 F.2d 403, 408 (5th Cir. 1969) (Wisdom, J.). Awards made by the NRAB division would be "final and binding upon both parties, except insofar as they

---

[2] The current NRAB consists of 34 members. 45 U.S.C. § 153(a) First.

shall contain a money award." 48 Stat. at 1191 (codified at § 153(m) First). If the carrier refused to comply with an award favoring the employee, the union could seek enforcement of the award in federal district court. *Id.* (codified at § 153(p) First). This provision also stated that "on the trial of such suit the findings and order of the division of the Adjustment Board shall be prima facie evidence of the facts therein stated." *Id.* To be sure, the exception for "money awards" and the "prima facie evidence" provision were at odds with the general finality (and exclusivity) of the RLA scheme. *See Chicago River*, 353 U.S. at 39 (holding that the labor organizations conceded their right to strike over minor disputes, because "there was general understanding between both the supporters and the opponents of the 1934 amendment that the provisions dealing with the Adjustment Board were to be considered as compulsory arbitration in this limited field"); *Price*, 360 U.S. at 616 (holding that employees conceded their right to seek federal review of NRAB determinations, because the 1934 amendments were meant to largely "foreclose litigation" over minor disputes). The confusion led some courts of appeal to permit effectively de novo review of money awards when the employee brought an enforcement proceeding against a noncompliant carrier. *Central Georgia*, 415 F.2d at 408. However, in 1965 the Supreme Court held that judicial review of money awards could not include reassessments of the underlying merits of the NRAB determination. *Gunther v. San Diego & Ariz. E. Ry. Co.*, 382 U.S. 257 (1965). Citing its prior review of the legislative history in *Chicago River* and *Price*, the Supreme Court recognized that NRAB decisions were meant to have "the same finality that a decision of arbitrators would have." 382 U.S. at 263.

Given this finality, however, the 1934 scheme proved unequal and unfair with respect to judicial review. Specifically, there was a "disparity in judicial review of Adjustment Board orders" between the carriers and employees. *Price*, 360 U.S. at 614. "[A]n enforcement proceeding against a noncomplying carrier under [Section 3] First (p) affords the defeated carrier some opportunity to relitigate the issues decided by the Adjustment Board." *Id.* No such review was available for employees when they were defeated before the NRAB. However, the Supreme Court maintained something of a loophole to the otherwise exclusive NRAB scheme, allowing employees the choice of whether to bring wrongful discharge cases in court or before the NRAB. *Moore v. Ill. Cent. R.R. Co.*, 312 U.S. 630 (1941); *Slocum v. Del. L. & W. R.R. Co.*, 339 U.S. 239 (1950); *Transcon. & W. Air v. Koppal*, 345 U.S. 653 (1953).

Congress again amended the RLA in 1966, this time ensuring equity between labor and management with respect to judicial review but also confirming an arbitration-like finality for NRAB determinations. Congress had recognized that "the one-sidedness of existing law [wa]s extremely unfair to employees" and its "principal purpose" for amending the law was "to provide equal opportunity for judicial review." H. Rep. No. 89-1114, at 15, 3.[3] Congress thus added a new

---

[3] The Report's other principal purpose was to remedy the significant backlog of cases before the First and Third Division of the NRAB. The solution, created by the 1966 law, was to allow an alternative option for the adjustment of minor disputes. By mutual agreement, the carrier and union could agree to have the dispute heard by a special board, consisting of one NRAB representative from the carrier, one NRAB representative from the union, and one neutral member chosen by the NMB. In all substantive respects, the determinations of these special boards were treated identically to those made by the divisions of the NRAB. These

provision, § 153(q) First, allowing employees to seek judicial review:

> If any employee or group of employees, or any carrier, is aggrieved by the failure of any division of the Adjustment Board to make an award in a dispute referred to it, or is aggrieved by any of the terms of an award or by the failure of the division to include certain terms in such award, then such employee or group of employees or carrier may file in any United States district court in which a petition under paragraph (p) could be filed, a petition for review of the division's order. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Adjustment Board. The Adjustment Board shall file in the court the record of the proceedings on which it based its action. The court shall have jurisdiction to affirm the order of the division, or to set it aside, in whole or in part, or it may remand the proceedings to the division for such further action as it may direct. On such review, the findings and order of the division shall be conclusive on the parties, except that the order of the division may be set aside, in whole or in part, or remanded to the division, for failure of the division to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction,

---

special boards are referred to as "Public Law Boards," after the public law that created them. Pub. L. No. 89-456, 80 Stat. 208 (1966).

> or for fraud or corruption by a member of the
> division making the order. The judgment of
> the court shall be subject to review as
> provided in sections 1291 and 1254 of
> Title 28.

45 U.S.C. § 153(q) First. Even while expanding the availability of judicial review to employees and carriers alike, Congress also limited the scope of that review. The exception for "money awards" was removed from § 153(m) First, and the "shall be prima facie evidence of the facts therein stated" language in § 153(p) First was replaced with "shall be conclusive on the parties." 80 Stat. 208, 209–210. Furthermore, Congress felt that, "because the [NRAB] has been characterized as an arbitration tribunal, the grounds for review should be limited to those grounds commonly provided for review of arbitration awards": whether the NRAB failed to comply with statutory requirements, whether the NRAB had jurisdiction over the claim, and whether there was "fraud or corruption" on the part of any NRAB member. S. Rep. 89-1201, at 3, 6–7. These three grounds are reflected in § 153(q) First, and § 153(p) First was amended accordingly. 80 Stat. at 210. These judicial review provisions are narrow—indeed, in 1978, the Supreme Court suggested that "the scope of judicial review of Adjustment Board decisions is among the narrowest known to the law." *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 91 (1978).[4]

---

[4] In *Union Pac. R.R. Co. v. Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent. Region*, 130 S. Ct. 584 (2009), the first Supreme Court case to address the RLA in almost thirty years, the Supreme Court held that the portion of § 153(q) First reading "to conform, or confine itself, to matters within the scope of the division's jurisdiction," permits judicial review of an aggrieved union's claims that an NRAB panel unlawfully declined to exercise jurisdiction over the union's petition

Following the 1966 amendments, because judicial review was now equally available to employees, the Supreme Court overruled *Moore*. *Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320 (1972). After *Andrews*, it was clearly established law that employees had no choice but to rely solely on the NRAB for "some measure of justice" with respect to their minor disputes. Thus, as the law stands today, precisely because the RLA scheme for minor dispute resolution depends entirely on the effectiveness of the NRAB determinations, the narrow judicial review of those determinations is designed to protect the integrity of the NRAB arbitral process.

## B. Factual History

Judicial review of possible corruption within the National Railroad Adjustment Board arbitral scheme is the subject of this suit. The suit arises out of the Railway's discharge of Richard Kite,[5] a conductor for the Railway, an employee of twenty-seven years, and a member of the Union. On the morning of January 17, 2005, the Railway conducted random blood alcohol testing of Kite and his crew, as they reported for service on a train traveling from Pasco, Washington to Vancouver, Canada. The breathalyser test reported Kite as having a blood alcohol level of 0.029 percent. Another test performed twenty minutes later reported a level of 0.027 percent. Under the Railway's Policy on the Use of Alcohol and Drugs, any level above 0.02 percent is considered a

---

for arbitration. *Id*. at 599. That portion of § 153(q) First, however, is not at issue in this case.

[5] Because this case was dismissed on the pleadings, the description in this section is based largely on the allegations in the Union's complaint.

positive test. Kite was asked to report to an investigative hearing, during which the Railway concluded that Kite had reported for work under the influence of alcohol, in violation of General Code of Operating Rules 1.5. Furthermore, because the Railway determined that Kite had a prior positive test in 1997, and because the Railway's Policy on the Use of Alcohol and Drugs mandated dismissal for a second positive alcohol test within ten years, the Railway discharged Kite from employment. The Union spent the next year unsuccessfully appealing the discharge within the Railway's internal dispute resolution system. Because settlement had failed, the dispute (which was a minor dispute under the RLA) became subject to mandatory arbitration by the NRAB. 45 U.S.C. § 153(i) First. The parties, however, elected to resolve the dispute by establishing a special adjustment board (i.e., a "Public Law Board") under 45 U.S.C. § 153 Second. Public Law Board (PLB) 7204 consisted of Roger Boldra (Director of Labor Relations for the Railway), Jay Schollmeyer (General Chairman of the Union), and Jacalyn Zimmerman (neutral arbitrator, picked by the NMB). Kite's case was assigned to PLB 7204 as Case No. 4.

On July 31, 2008, PLB 7204 heard Kite's case. The Union presented two arguments before the Board. First, it challenged the accuracy of the breathalyser test. Kite admitted to having consumed alcohol the evening prior to the incident, but denied that he arrived for work under the influence of alcohol. The Union noted that the Railway could not produce maintenance records for the breathalyser. Second, it challenged the punishment as excessive.

Specifically, the Union observed that the Railway had failed to present any evidence of the earlier positive test. Kite, it urged, should therefore be treated as a first-time offender.

On November 7, 2008, Zimmerman circulated a draft award ruling in Kite's favor (Zimmerman Draft Award).[6] Zimmerman was unpersuaded by the Union's first argument and concluded that Kite had reported for work on January 27, 2005 under the influence of alcohol, in violation of General Code of Operating Rules 1.5. However, Zimmerman agreed with the Union's second argument, that the record did "not include any evidence establishing that [Kite] in fact had a previous drug/alcohol violation. Therefore, based upon the record before us, this is [Kite's] first positive result." Zimmerman recognized the seriousness of an alcohol violation but determined that, in light of Kite's twenty seven year employment with the Railway, dismissal would be excessive punishment for a first-time offense. The Zimmerman Draft Award thus concluded that Kite should be reinstated without backpay, following the completion of a rehabilitation program. In circulating the draft award, Zimmerman offered both parties the opportunity to discuss her decision in an Executive Session. On January 8, 2009, Boldra, the Railway representative, requested an Executive Session. The alleged corruption that is at the heart of this case occurred during the Session.

On February 19, 2009, Zimmerman held the Executive Session, which the Board members attended via telephone.

---

[6] The "November 7, 2008" date appears in the Union's complaint. However, the record before us suggests that Zimmerman's email circulating the draft order was dated December 22, 2008. This discrepancy has no substantive effect on our determination.

On the call, Boldra expressed his disagreement with Zimmerman's decision and asked her to reverse it. Zimmerman refused, citing her notes from the hearing, which she said supported her conclusion. Boldra then allegedly stated, "If you are going to issue these kinds of opinions, *you will never work for a Class One railroad again*." Although Boldra has since denied using those exact words, the Railway does not contest that he made the statement. Zimmerman's response was to state, according to the Union's Petition for Review, "that all she could do at that point was recuse herself."

On April 20, 2009, Zimmerman issued an order dismissing the case without prejudice (Zimmerman Order). Based on the record available to us, the details of what occurred in this two month period between the Executive Session and the Order are not entirely clear. On February 27, 2009, after Zimmerman announced her intention to recuse herself, Boldra asked the NMB to reassign Kite's case to another existing Public Law Board, specifically PLB 7254, which consisted of Boldra, Schollmeyer, and a different neutral arbitrator, Robert Petersen. Schollmeyer objected to the reassignment, although his rationale was that the NMB might not provide funding for the case to be reheard before PLB 7254. On April 6, 2009, the NMB denied Boldra's request for reassignment because its records showed that Zimmerman had "rendered a decision" in Kite's case. Apparently, because Zimmerman had submitted a bill when she circulated the draft award, the NMB had assumed that she had made a final determination. Zimmerman apologized to Boldra and Schollmeyer and offered to straighten out the

situation with the NMB.**[7]** Shortly thereafter, on April 20, 2009, Zimmerman issued a short order, stating "[a]fter due consideration, the Board has determined that this matter should be dismissed without prejudice."**[8]** At some point

---

[7] On April 6, 2008, Boldra forwarded the NMB denial to Zimmerman. On the same day, Zimmerman wrote to Bolda and Schollmeyer:

> Good afternoon Roger and Jay:
>
> Do you want me to write to Ronald Watkins [Director of Arbitration Services for the NMB]? This is apparently not straightened out...
>
> Let me know. Sorry this is so difficult.
>
> Talk to you soon.
>
> Thanks, Jackie.

After Boldra responded affirmatively, Zimmerman then wrote:

> I'll give him a call. This is a problem with the system – we are supposed to bill when we send drafts to parties, not when the final awards go out. So that leaves open the possibility for something like this. I'll let you know if I get anywhere.
>
> Thanks for the patience. Talk to you soon.
>
> Jackie.

[8] This sentence appeared under the heading "Award," a point that the Union repeatedly emphasizes in arguing that the Zimmerman dismissal is an award. As we discuss *infra*, the order/award distinction is irrelevant for purposes of judicial review. We therefore treat the dismissal without prejudice as an order, because that is the ordinary procedural description of such an action.

thereafter, Zimmerman resigned from the business of being a neutral arbitrator for the NMB.

On April 30, 2009, the NMB added Kite's case to PLB 7254 as Case No. 28. Schollmeyer officially filed another objection, but consented to having Peterson hear the case. Peterson proceeded to do so. Almost one year later, on April 29, 2010, Peterson issued an award ruling in the Railway's favor (Peterson Award). Peterson first held that he was not bound by Zimmerman's prior determination in favor of Kite, because it was merely a "draft" and never "formally adopted." Peterson then addressed the merits of Kite's discharge and found that "a proper basis exists to hold or conclude that [Kite] did have a prior drug/alcohol violation in May 1997."[9] Peterson also rejected the Union's challenge to the breathalyser. Consequently, Peterson found that Kite had tested positive twice in a ten year period and therefore dismissal was appropriate. He issued an award in favor of the Railway. Schollmeyer signed the award but testified via affidavit that he "oppose[d] the result." He specifically

---

[9] Although Peterson recognized that no "document was placed into evidence" regarding the May 1997 positive alcohol test, he found multiple instances in the record where the parties referred to the existence of such a test. Peterson found these references sufficient to conclude that Kite had a prior violation. It is unclear, from the record before us whether Peterson's conclusion was based in part on arguments and/or evidence that were not made or presented before Zimmerman, although for purposes of a motion—where we draw all inferences in favor of the non-moving party—we assume that it was. Whether or not new materials or arguments were presented to Peterson is not, in any event, dispositive of the motion to dismiss, as the Union objects to affording the Railway a second opportunity to obtain a favorable ruling after it succeeded by allegedly corrupt means in compelling the first neutral member of the Board to resign some two months after her circulation of a draft opinion favoring Kite.

asserted that he told Peterson "about Boldra's threat to Zimmerman," and that he "thought it was improper."

## C. Procedural History

On November 4, 2010, the Union filed a Petition for Review in federal district court. The Petition sought vacatur of both the Peterson Award on the merits and the Zimmerman Order of dismissal without prejudice as having been procured through fraud or corruption by the Railway. It also requested that the Zimmerman Draft Award in favor of Kite "be reinstated and enforced." The Union specifically alleged that "Boldra's actions in threatening Referee Zimmerman with economic ruin in retribution for her decision in the [Draft Award] and Referee Zimmerman's subsequent [Order] dismissing the appeal constitute fraud and corruption within the ambit of 45 U.S.C. § 153(p) First." The Union further alleged that the Railway's actions in re-listing the case to reverse an unfavorable decision constitutes "fraud and corruption."[10]

The Railway filed a motion to dismiss the Petition under both Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). Under 12(b)(1), the Railway argued that the district court lacked subject matter jurisdiction over the Zimmerman Draft Award, because the RLA permitted appeal of only final awards. Because the Zimmerman Draft award was unsigned and self-described as a "draft" award, the Railway stated, no appeal could lie under the RLA. The Railway's motion to dismiss did not specifically challenge jurisdiction over the

---

[10]  The Petition also presented various state law claims against the Railway. The district court rejected these claims, and the Union has chosen not to appeal them. We therefore do not discuss those claims here.

Zimmerman Order. However, under 12(b)(6), the Railway argued that the Union had failed to state a claim upon which relief can be granted, because the alleged facts did not amount to fraud or corruption. Although the motion is not a paragon of clarity, we can discern four different arguments that could be construed to support the Railway's position. First, the Railway disputed the assertion that Boldra "bullied [Zimmerman] into submission to change the outcome." Rather, the Railway suggested that Boldra merely "reminded her" of the importance of the case. Second, the Railway suggested that the Union waived its RLA claim by not presenting the fraud or corruption allegation to the NMB or Peterson until after Peterson had ruled against Kite. Third, the Railway argued that, whereas the RLA was only meant to correct "extrinsic fraud," the alleged fraud here was "intrinsic" to the proceedings (because the Union knew of it) and was therefore resolvable by advocacy. Fourth, the Railway argued that the aggressive statements of the partisan member of a Board fall short of the high standard required to prove fraud under the RLA. Despite these varied arguments, the Railway did not challenge the Union's claim that, if it could prove that fraud or corruption occurred due to the conduct of Boldra during the Zimmerman proceedings, the Railway's attempt to re-list the case with Peterson also constituted fraud or corruption. The Union filed a response and the Railway filed a reply in timely fashion.

The district court granted the motion to dismiss under both 12(b)(1) and 12(b)(6). It dismissed the claims relating to the Zimmerman proceedings under 12(b)(1), finding that it did "not have jurisdiction over the Zimmerman arbitration because that arbitration did not produce an award." Its rationale was brief. The district court quoted the first half of the first sentence of 45 U.S.C. § 153(q) First, and concluded

that federal review was limited to final awards only. It concluded that, because the Zimmerman Draft Award was not signed and hence not final, it was not an appealable award under § 153(q) First. As a result of the dismissal of the challenge to the Zimmerman arbitration for lack of subject matter jurisdiction, the only issue remaining was the challenge to the Peterson arbitration.

The district court then dismissed the claim relating to the Peterson proceedings under 12(b)(6), finding that the Union's alleged facts did not constitute fraud or corruption with respect to Peterson. The district court did not discuss the Railway's arguments, beyond expressly rejecting its waiver argument on the basis that the Union had alleged that it presented the corruption objection to Peterson.

The district court began its analysis by recognizing that the Union's allegations were "more akin to corruption than fraud" but was unable to "find cases distinguishing between the two." Believing that the case must be analyzed under fraud doctrine, the district court looked to *Pac. & Arctic Ry. & Nav. Co. v. United Transp. Union* (*Pacific & Arctic Railway*), 952 F.2d 1144, 1147 (9th Cir. 1991), which stated that fraud (1) "embraces a situation in which the supposedly neutral arbitrator exhibits a complete unwillingness to respond, and indifference, to any evidence or argument in support of one of the parties' positions," *id.* at 1148, and (2) must be used "to obtain the award" in question, *id.* at 1147. The district court then found that there was no fraud with respect to Peterson, because—by expressly refuting the Union's arguments in his written award—he did not display a complete unwillingness to respond to the Union's position. Moreover, the district court found that the Peterson arbitration was not implicated by the Railway's alleged

misconduct with respect to Zimmerman because that corruption did not "allow BNSF to obtain an award. The corruption alleged, at most, led only to Zimmerman's recusal, a dismissal without prejudice, and a new arbitration." On that basis, the district court dismissed the Union's Petition for Review.

## II. JURISDICTION

The district court dismissed the challenge to the Zimmerman Order of dismissal and to the failure of the Zimmerman Board to issue a final award for lack of jurisdiction. It dismissed the challenge to the award issued by the Peterson Board for failing to state a claim upon which relief may be granted. We first discuss the jurisdictional determination with regard to the Zimmerman proceedings.

In finding that it lacked subject matter jurisdiction over the Union's challenge to the Zimmerman actions, the district court both misunderstood the Union's Petition for Review and misapplied § 153(q) First. The district court ignored the Union's challenge to the Zimmerman Order (which dismissed the initial case without prejudice) and considered solely the Zimmerman Draft Award, which the Board failed to issue. However, as the Petition for Review makes clear, the Union *first* sought vacatur of the Zimmerman Order on the ground of fraud or corruption and *then* sought reinstatement of the Zimmerman Draft Award. Thus the first question for subject matter jurisdiction is whether, under § 153(q) First, the district court is authorized to review the Zimmerman Order

and, if so, its consequences.[11] Alternatively, the question is whether the district court has the authority to review the Zimmerman Board's failure to decide the grievance on the merits. We conclude, based on the text and underlying purpose of § 153(q) First, that district courts have subject matter jurisdiction over NRAB orders, not only awards, as well as over any failure of the Board to resolve a grievance in conformity with the terms of the statute.

We begin with the text of the provision, the first sentence of which reads as follows:

> If any employee or group of employees, or any carrier, is aggrieved by the failure of any division of the Adjustment Board to make an award in a dispute referred to it, or is aggrieved by any of the terms of an award or by the failure of the division to include certain terms in such award, then such employee or group of employees or carrier may file in . . . United States district court . . . a petition for review *of the division's order*.

45 U.S.C. § 153(q) First (emphasis added). As applied here, the review provision imposes four jurisdictional requirements: there must be (1) an employee, (2) a failure by the NRAB (or a Public Law Board) to make an award in a

---

[11] Of course, the district court must also have the authority to provide a remedy to the Union, a requirement that is met here. Section 153(q) First allows the district court "to affirm the order of the division, or to set it aside, in whole or in part, *or it may remand the proceedings to the division for such further action as it may direct*." (emphasis added). We discuss the remedy issue in greater depth in Section III.C *infra*.

dispute referred to it, (3) that failure must aggrieve the employee, (4) the employee must petition for review of the relevant order. All four requirements are met here. First, Kite is an employee of Railway. Second, Zimmerman dismissed Kite's case without prejudice, thus failing to make an award in the dispute. Third, Kite was aggrieved by the dismissal because the draft award was favorable—i.e., he was to be reinstated but for the dismissal. Fourth, the Union (on behalf of Kite) filed a Petition for Review seeking vacatur of the Zimmerman Order. Thus, it is clear that the Union's Petition for Review of the Zimmerman Order falls squarely within the subject matter set forth in § 153(q) First.

Our conclusion is underscored by the purpose of the 1966 amendments that created § 153(q) First. As explained *supra*, the amendments were specifically intended to allow aggrieved employees to challenge NRAB determinations in federal court. To be sure, the grounds for review were limited to specific claims, including fraud or corruption. Here, however, it is uncontested as a jurisdictional matter that the Union's claim is properly asserted under one of the specified grounds. Thus, to deny the Union's appeal on behalf of employee Kite under § 153(q) would harm the very person specifically meant to benefit from the inclusion of § 153(q) in the RLA.

The Railway presents two arguments in response, both of which are unavailing. First, it contends that the Union's challenge to the Zimmerman Order and the Zimmerman Board's failure to issue an award is newly presented on appeal. The Railway argues that, in the proceedings below, the Union sought only to have the Zimmerman Draft Award enforced. In support of its argument, the Railway observes that most of the Union's briefing before the district court was

dedicated to arguing that the Zimmerman Draft Award was a final award. The Railway also observes that the district court focused only on the Zimmerman Draft Award in its discussion.

The Railway commits the same error as the district court below by ignoring the Union's Petition for Review. The Petition for Review clearly specifies in multiple places that the Union sought vacatur of the Zimmerman Order of dismissal without prejudice on the ground of fraud or corruption. Moreover, in its Response to the Motion to Dismiss, the Union explained at length that its allegations are directed at both the Zimmerman Order and the Zimmerman Draft Award, as the dismissal order is what precluded the draft award from being given effect. It is true that the district court did not rule on the Zimmerman Order, but that was because it apparently misunderstood the nature of the review sought by the Union. Because the Petition itself requires the conclusion that the Union challenged the Zimmerman Order in the proceedings below,[12] we reject the Railway's waiver argument. *In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir. 1989) ("[I]ntermediate appellate courts may consider any issue supported by the record, even if the [trial] court did not consider it.").

---

[12]  It is irrelevant that the Union argued in its briefing below that the Zimmerman Draft Award was a final award. Many parties in litigation present arguments in the alternative. Here, in the event that our court might adopt an interpretation of § 153(q) First that judicial review was limited to final awards, the Union presented arguments in support of a broad reading of what constitutes a "final award" under the RLA. The broad interpretation became the primary topic of dispute in the briefing below, but it did not imply that the Union had forsaken its claim expressly set forth in its Petition that the Zimmerman Order should be set aside for fraud or corruption.

Second, the Railway contends that the Zimmerman Order is not reviewable because it is not a final award. Citing the text of § 153(q) First, the Railway argues that only final awards are reviewable. Because the Zimmerman Order was not a final award, the Railway argues that it is not reviewable.

We address and reject this flawed reading of § 153(q) First *supra*, as both contrary to the plain meaning and legislative purpose of the provision. The only response discernible from the Railway's briefing is that the phrase "the division's order" is a "clear reference to the documentation memorializing the award referenced in the first portion of the sentence." This gets statutory interpretation backwards. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). By choosing the word "order" when it easily could have repeated "award," Congress is presumed to have intended a broader category for judicial review than simply awards. Indeed, only this broader reading can give effect to the entirety of § 153(q), which specifically allows aggrieved employees to seek review when the NRAB "fail[s] . . . to make an award in a dispute referred to it." If review were limited to awards, these words would be superfluous, thus contradicting yet another canon of statutory interpretation. *Boise Cascade Corp. v. U.S. E.P.A.*, 942 F.2d 1427, 1432 (9th Cir. 1991) ("Under accepted canons of statutory interpretation, we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous."). These arguments affirm our earlier conclusion that district courts may review orders under

§ 153(q) First, not only awards. Moreover, because the order here constitutes a "failure . . . to make an award in a dispute referred to it," the order is reviewable for that reason as well.

At oral argument, the Railway attempted to reframe its argument as follows: although the Zimmerman Order is an "order," it is not the "kind of order" for which Congress created judicial review under § 153(q) First, because it was not approved by a majority of the Board.[13] As a preliminary matter, we doubt the applicability of this argument to a recusal order, which is ordinarily issued by one judge. Moreover, the Railway provides no case to support its reading of § 153(q) First, and all the citations provided in its brief are specific to the context of awards. In any event, the Railway's reframed argument is contradicted by the text, structure, and legislative purpose of 45 U.S.C. § 153 First. The statute is undeniably silent with respect to whether an order requires majority approval. While we ordinarily cannot infer much from silence, we are assisted here by the fact that the statute is not silent with respect to whether an *award* requires majority approval; under § 153(n) First, a majority vote of the Board is required to issue an award. Because Congress was capable of and chose not to include the majority-vote requirement in the statutory provision regarding *orders*, § 153(o) First, ordinary rules of statutory interpretation dictate that we interpret the text as not imposing such a requirement regarding orders. *See Russello*, 464 U.S. at 23. Moreover, when § 153(n) First is read in conjunction with § 153(q) First, it is apparent that Congress intended that some

---

[13] The Railway also asserted that a reviewable order must fully dispose of all the issues in the case. That requirement is clearly met here, as the Zimmerman Order dismissed the case in its entirety, thus disposing of all of the issues.

orders lacking majority approval be subject to judicial review. Specifically, although under § 153(n) First, two members must approve an award that resolves any matters finally, Congress expressly provided, under § 153(q) First, for review when the Board has *failed* to make an award in a dispute referred to it. The logical consequence of these two provisions is that Congress allowed for review of a decision that necessarily results from failure to make an award, i.e., that necessarily results from a lack of majority agreement upon a question or a failure of a majority to resolve a question. Thus, in the subset of cases in which the failure to make an award is reflected in an order—e.g., a dismissal order, as we have here—that order, lacking majority approval, would be reviewable. To hold otherwise would violate the cardinal rule of statutory interpretation that courts must "make every effort" to give effect to the entirety of a statute. *See Boise Cascade Corp.*, 942 F.2d at 1432. Finally, only this conclusion is consistent with the purpose of the RLA scheme overall. As explained *supra*, Congress imposed mandatory arbitration by the NRAB as the exclusive and comprehensive means for employees to resolve grievances but allowed for judicial review to protect the reliability of those arbitral determinations and to ensure that covered grievances were resolved by that Board. If either side, labor or management, can use threats to frustrate the process and force the recusal of a neutral arbitrator, precisely the concerns for which Congress created judicial review are raised. We therefore reject the Railway's reframed second objection and hold that the district court has jurisdiction to review the Union's challenge to the Zimmerman Order, the failure to issue the Draft Award, and indeed to its failure to resolve the grievance assigned to the Zimmerman Board.

As to the Peterson Award, none of the above objections applies, and the district court correctly found that it had jurisdiction over that Award. The Railway's objection to the Union's challenge to that Award is based solely on 12(b)(6), a failure to state a claim of corruption. We turn now to that issue.

### III. CLAIM FOR RELIEF

### A. Waiver

As a preliminary matter, we address and dispose of the Railway's waiver argument. Citing a Seventh Circuit case, *Pokuta v. Trans World Airlines, Inc.*, 191 F.3d 834, 840 (7th Cir. 1999), the Railway urges that we apply the general principle that failure to raise an allegation of bias by an arbitrator until after entry of the final award constitutes waiver of the claim to § 153(q) of the Railway Labor Act. Applying this rule, the Railway argues that the Union failed to raise its objection regarding corruption either to the NMB or Peterson. Specifically, the Railway contends that, while Schollmeyer did write to the NMB objecting to the reassignment, he did so on the basis that the NMB might not fund the second Board. Therefore, the Railway argues, because the Union failed to raise an objection regarding corruption, it has waived the claim.

This case does not require us to decide whether to import the waiver-of-arbitration-bias rule into the Act. Rather, we agree with the district court that, at the motion to dismiss stage, the Union properly alleged that it raised the corruption objection to Peterson. *United Transp. Union v. BNSF Ry. Co.*, No. 10-CV-05808, 2011 WL 3055226, at *5 (W.D. Wash. July 25, 2011) ("For the purposes of this Motion, the Court

must assume UTU made the corruption argument to Peterson and that Peterson ignored it.") Although the Railway is correct that Schollmeyer's objection to the NMB was not based on any allegation of corruption, it ignores his declaration, where he stated the following:

> I did sign the award which came out of PLB 7254, but my reasons for doing so are not accurately portrayed at the brief of the BNSF at Page 11, lines 4–5. My signature does not equate with a concurrence in the result. It is meant only to signify that I was present and participated in the hearing and the discussion. *I oppose the result. I told Boldra and Peterson specifically about Mr. Boldra's threat to Zimmerman in February of 2009, at executive session, about the recusal and the dismissal, and how I thought it was improper.* Obviously, those arguments weren't successful with the majority of PLB 7254.

Boldra contests this assertion in his declaration, but at the motion to dismiss stage, we accept the facts as they are alleged by the plaintiff. Therefore, even under the Railway's preferred rule (which we neither adopt nor reject), we find that the Union did not waive its corruption claim.

## B. Corruption

When deciding whether a pleading states a plausible claim for relief, we are required by Rule 12(b)(6) to consider a complaint's factual allegations "together with all reasonable inferences" from those allegations. *Cafasso, U.S. ex. re. v. General Dynamics C4 Systems, Inc.*, 637 F 3d 1047, 1054

(9th Cir. 2011). Applying that standard, we conclude that the Union properly stated a claim upon which relief may be granted under § 153(q) First of the Act. It is important, as a preliminary matter, to distinguish between the Zimmerman Order and the Peterson Award, both of which can, if the Union can prove its allegations, be set aside as the product of corruption, but for different (although related) reasons. With regard to the Zimmerman Order, the district court did not address whether the Union properly alleged corruption because it had already granted dismissal under 12(b)(1). Nevertheless, the Union's allegations present a plausible claim for setting aside the Zimmerman Order. If Boldra, as a high-ranking Railway official and as the Railway's representative on the Board, made such a statement and intended it as an economic threat against Zimmerman if she did not change the outcome of the Zimmerman Order, then Boldra committed an act of attempted extortion and impaired the integrity of the arbitral process itself. Because such conduct by any member of a Board would justify setting aside the Order, we conclude that the Union properly stated a plausible claim for which relief could be granted with regard to both the Zimmerman Order and the Board's failure to decide the dispute.

If the Union's allegations are true, the Peterson Award can also be set aside as the product of corruption. The Union alleges that Peterson was made aware that the Railway had threatened the prior neutral arbitrator with economic ruin when she circulated her tentative ruling against the Railway. It is therefore plausible, under the Union's allegations, that Peterson's decision reflected precisely the same fear regarding the Railway's threat as did Zimmerman's when she decided to dismiss the proceeding after being told that she would be unable to work for a Class One railroad again if she

issued decisions like the one in this case. Accordingly, we conclude that the Union has properly stated a claim upon which relief can be granted with regard to the Peterson Award.

### 1. Zimmerman Order

In order to assess the Union's claim, we must first define "corruption" under the RLA.[14] The legislative history behind the 1966 amendments is explicit that Congress intended that review for corruption under the RLA would mirror review for corruption in arbitral decisions generally. H. Rep. 89-1114, at 3, 16. Because the Federal Arbitration Act (FAA), initially enacted in 1925, allows vacatur "where the award was procured by corruption, fraud, or undue means," 9 U.S.C. § 10(a)(1), one might expect to find reasonably developed federal doctrine on what constitutes "corruption" in cases under the FAA. In fact, while many FAA cases discuss "fraud" or "undue means," no case by the Supreme Court or a court of appeals discusses the "corruption" prong of arbitral decisions.

---

[14] Because we analyze the Union's claim as one of corruption, we do not respond in detail to the district court's discussion applying the fraud test, as set forth in *Pacific & Arctic Railway*, 952 F.2d 1144 (9th Cir. 1991). Because the Railway's brief on appeal mirrored the district court's reliance on fraud, we also do not respond to its contentions.

This should not, however, be read as an endorsement of the district court's reasoning in applying the fraud doctrine. Indeed, the district court's suggestion that Peterson could not have committed fraud because he mentioned the Union's arguments before dismissing them is plainly incorrect. Mentioning a party's arguments (and then ruling against the party) does not show a lack of fraud or corruption.

Despite the absence of FAA doctrine specifically defining what constitutes corruption, we are not left without guidance. As explained in Section I.A, Congress created the NRAB scheme to ensure an expeditious resolution to minor disputes in the railroad industry. Accordingly, it intended that NRAB decisions be accorded a degree of finality and thus limited judicial review to the narrow grounds set forth in 45 U.S.C. 153(q) First. Being mindful of Congress's interest in the finality in the NRAB scheme, we must ensure that the definition of corruption under the RLA encompasses only serious misconduct—i.e., conduct of the sort that would justify vacatur of an NRAB decision. *See Pacific & Arctic Railway*, 952 F.2d 1144, 1148 (9th Cir. 1991) (adopting a more rigorous test for "fraud" under the RLA than the test for "fraud" under common law because of the "strong federal policy favoring finality"); *Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293, 1297 (9th Cir. 1982) ("[I]n order to protect the finality of arbitration decisions, courts must be slow to vacate an arbitral award . . . ."); *see also Toyota of Berkeley v. Auto. Salesman's Union, Local 1095, United Food & Commercial Workers Union*, 834 F.2d 751, 755 (9th Cir. 1987) (stating that the "appearance of impropriety, standing alone, is insufficient to" vacate an arbitral proceeding), *amended*, 856 F.2d 1572 (9th Cir. 1988).[15]

We therefore hold that corruption under the RLA encompasses three categories of conduct. First, corruption

---

[15]   Courts have also recognized that arbitration omits many of the niceties of federal courts, and "whatever indignation a reviewing court may experience in examining the record, it must resist the temptation to condemn imperfect proceedings without a sound statutory basis for doing so." *Forsythe In'l, S.A. v. Gibbs Oil Co. of Texas*, 915 F.2d 1017, 1022 (5th Cir. 1990).

includes acts that threaten the integrity of arbitral proceedings that are either quasi-criminal or criminal in nature, including, but not limited to, acts of violence or threats thereof. Second, corruption encompasses acts of bribery and extortion[16] that threaten the integrity of arbitral proceedings, the latter of which includes, but is not limited to, threats of economic injury.[17] Third, corruption extends to similarly egregious abuses of office that threaten the integrity of arbitral proceedings. Additionally, as with fraud under the RLA, corruption must be proven by clear and convincing evidence. *Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293, 1297 (9th Cir. 1982). By limiting corruption to the categories set forth above and by adopting a heightened evidentiary standard, we ensure that NRAB determinations maintain the presumption of finality that Congress intended.

We turn now to the facts of the case. If the Union's allegations are taken in the light most favorable to it as the non-moving party, we conclude that Boldra's statement to the neutral member, upon reviewing her proposed decision, that "[i]f you are going to issue these kinds of opinions, you will never work for a Class One railroad again," can, if proven in subsequent proceedings, plausibly bear the Union's interpretation as a threat of economic retaliation that threatens the integrity of arbitral proceedings. We explained *supra* that

---

[16] We also agree with the argument that "extortion" is a species of "bribery." *Cf. Wilkie v. Robbins*, 551 U.S. 537, 564 n.12 (2007) ("[T]he Hobbs Act expanded the scope of common law extortion to include private perpetrators while retaining the core idea of extortion as a species of corruption, akin to bribery.").

[17] An act of attempted bribery or extortion, so long as it threatens the integrity of arbitral proceedings, would also constitute corruption under the RLA.

a threat of economic injury that threatens the integrity of arbitral proceedings is a form of extortion, which is a category of corruption under the RLA. Thus, if we take the Union's allegations as true and accept the meaning of Boldra's statement that the Union imputes to it, as we must at this stage of the proceedings, Boldra committed an act of attempted extortion, and his conduct would therefore constitute corruption under the RLA.

The Union's understanding of Boldra's statement is not, of course, the only possible interpretation. Under other interpretations, the statement might not support a finding of corruption, and we do not, by this opinion, prejudge whether Boldra's conduct actually constituted corruption under the RLA. The Railway, for example suggests a very different interpretation of Boldra's alleged statement. It claims that, at the executive session, Zimmerman said that her notes reflected that Boldra had previously agreed that reinstating employee Kite would be an acceptable result. Boldra swore by declaration that he told Zimmerman that her notes were incorrect and that he had never so agreed. He further claims that he made the alleged statement in order to remind Zimmerman of the importance of the case to Railway because it involved what the Railway understood to be an employee's second-time alcohol violation. Under the Railway's interpretation, Boldra likely meant to convey his belief that Zimmerman's draft award was so erroneous, or apparently biased, that it would destroy Zimmerman's credibility in the labor arbitration industry. Such a prediction, though potentially inappropriate in a professional setting, may not be tantamount to extortion.

As with the Union's interpretation, this is a possible construction of Boldra's statement, but a fact-finder would

have to determine whether, in the context of the particular case before it, the statement warranted a finding of extortion. This is true with respect to the Union's interpretation, the Railway's, and other possible interpretations as well. The question of the meaning of Boldra's statement cannot be resolved at the stage of a motion to dismiss, and we leave to the fact-finder the ultimate determination of what Boldra actually said and whether any statement he may have made constituted corruption.

### 2. Peterson Award

As explained *supra*, the Union alleges that it communicated Boldra's misconduct in the first arbitration to Peterson. We can therefore infer that Peterson was fully aware that, when a neutral arbitrator had proposed ruling against the Railway, the Railway's representative had threatened the arbitrator with never working again for a Class One Railroad. It is therefore plausible, as the Union alleges, that Peterson himself wanted to work for a Class One Railroad again, and might have been concerned that he, like Zimmerman, would be threatened if he chose to rule against the Railway. Based on these allegations, Peterson's issuance of the Award in favor of the Railway could conceivably be the result of corrupt action, for reasons similar to those related to the Zimmerman Order. Of course, the Union would have to substantiate its allegations by clear and convincing evidence at the summary judgment phase, or perhaps at a trial. Because we deal only with this case at the motion to dismiss stage, we need conclude only that the Union's allegations state a plausible claim upon which relief can be granted. They do so here.

Even if the Union were unable to prove that Peterson acted under an implicit threat in issuing an award in favor of the Railway, § 153(q) First nevertheless allows for the setting aside of the Peterson Award as the tainted product of Boldra's alleged corruption, if such corruption (as defined herein) is proved by the Union by clear and convincing evidence. Section 153(q) First states that the district court may "set aside" an order "for fraud or corruption by a member of the division making the order." Under the plain terms of the statute, the Peterson Award can be set aside because Boldra was a member of the Peterson Board and, under the Union's allegations, he acted corruptly. Moreover, under those allegations, the Peterson Board would not have existed *but for* corruption by Boldra. That is, had Boldra not threatened Zimmerman, who then recused herself, there would have been no Peterson proceedings and hence no Peterson Award. Furthermore, the Union's allegations state that Boldra's corruption had a direct causal relationship to the Peterson Award. The Union contends that the Railway's intended purpose in leveling the economic threat against Zimmerman was, inter alia, to re-list the case and acquire a new hearing in which it might (and did) prevail. Indeed, because the Railway's deficiency in the Zimmerman proceedings was apparently a failure to include evidence of the discharged employee's prior violation, a second hearing offered Boldra an opportunity to enhance his arguments before a new neutral arbitrator. Thus, under the allegations set forth in the Union's Petition for Review, the Peterson Award was both the intended and actual product of Boldra's alleged corruption. Accordingly, under § 153(q) First, the Peterson Award can be "set aside . . . for corruption" by Boldra, the Railway's representative in the proceeding and a necessary voting

member in order to achieve a majority award in favor of the Railway.[18]

The Railway asserts that the Peterson Award should instead be viewed as curing the alleged corruption that occurred during the Zimmerman proceedings. It contends that, because no threat was made during the Peterson proceedings, Peterson's decision to issue the award in the Railway's favor was based on his independent, neutral judgment. The Peterson Award, it argues, is therefore the outcome that the Railway would have acquired had it been given a new hearing without a corrupt arbitrator. The Railway contends that the Union may not be happy with the Peterson Award, but the harm from the alleged corruption has been cured by the issuance of that Award.

This argument fails on several accounts. First, as a preliminary matter, the Union's allegations contradict the premise that, because no explicit threat was made during the Peterson hearing, no threat could have affected the outcome of those proceedings. The Union alleges that, because Peterson was fully aware of the threat made during the Zimmerman proceedings, the threat actually carried over into the Peterson proceedings. Thus, at the motion to dismiss

---

[18] The district court believed that the Peterson Award could not be set aside because the alleged corruption had not been used "to obtain the award." *Pacific & Arctic Railway*, 952 F.2d 1144, 1151 (9th Cir. 1991). In fact, as explained *supra* in text, under the allegations of the complaint, that is exactly what the Railway was seeking to accomplish with its economic threat to Zimmerman: acquire a new hearing in which it could prevail. It is true that the Railway could not *guarantee* itself an award in its favor. However, there is no guarantee requirement in *Pacific & Arctic Railway*. If the Railway used corruption "to obtain the [Peterson A]ward," it can be set aside.

stage, drawing all inferences in favor of the non-moving party, we cannot accept the Railway's argument. Second, and more fundamental, the Railway's argument is properly one of remedy: that the remedy for the alleged corruption at the Zimmerman proceedings would have been to remand for a new hearing before a different neutral arbitrator and that such a hearing effectively occurred here in the form of the Peterson proceedings. As we discuss further *infra*, we cannot determine the appropriate remedy at this stage of the proceedings, and thus the Railway's argument is premature. Third, even if an untainted hearing were the appropriate remedy, the Peterson proceedings fail to meet this description because Boldra, the Railway representative who allegedly made the threat of economic retribution, was a member of the Board that issued the Peterson Award and a necessary signatory to it. Even if the Peterson Award were free of Zimmerman's alleged taint, it is not free of Boldra's. Thus, as alleged, the Peterson Board and the Peterson Award were tainted. These and other factual matters may be litigated at the summary judgment or trial stage. We cannot conduct a factual inquiry here. At this stage, however, on the basis of the Union's allegations, we reject the Railway's curing argument and hold that, in asking the district court to set aside the Peterson Award, the Union stated a claim upon which relief can be granted.

## C. Remedy

Because we hold that the district court erred in dismissing the Petition for Review on 12(b)(1) and 12(b)(6) grounds, we remand the case to that court to allow the Union to attempt to prove its allegations of corruption by clear and convincing evidence.  If the Union prevails on the merits and the district court sets aside the Zimmerman Order and/or the Peterson

Award due to corruption, it would then have to consider what remedy might be appropriate. The RLA broadly empowers the district court to provide a remedy that it deems appropriate. 45 U.S.C. § 153(q) First (allowing the district court "to affirm the order of the division, or to set it aside, in whole or in part, *or it may remand the proceedings to the division for such further action as it may direct*" (emphasis added)). Under this broad power, the district court has a number of alternatives. It may remand the case back to the Board for a new untainted hearing; it may remand for a new hearing subject to various procedural or substantive limitations; it may remand allowing the Board to make its own determination as to how to proceed (including what evidence may be introduced or shall be excluded at any further hearing); or it may direct such further action by the Board as the court deems appropriate. In its Petition for Review, the Union asked for reinstatement of the Zimmerman Draft Award. Although the district court is empowered to provide for such a remedy or to allow the Board to decide whether to do so, we cannot determine at this stage of the proceedings that this would be an appropriate remedy in this case. Nor is it our function to make such a determination now. Any such decision must be based on the facts, as established at summary judgment or proven at trial.

## IV. CONCLUSION

The district court erred with respect to jurisdiction, because it failed properly to apply 45 U.S.C. § 153(q), a provision enacted to allow aggrieved employees to seek judicial review of NRAB determinations in federal court. It also erred with respect to the merits, because it evaluated the Railway's conduct as fraud—not corruption. More important, because it failed to draw inferences in the light most

favorable to the Union, it failed to recognize that, under the applicable pleading standards, Boldra's alleged statement can reasonably bear the Union's interpretation of it as a threat, and thus Boldra's conduct could have constituted corruption under the RLA. While the final determination regarding Boldra's statement must be left to a fact-finder, the Union's construction is plausible and hence sufficient to survive a motion to dismiss.

The RLA created a unique machinery for the disposition of minor disputes in the railway industry. Much deference is given to the determinations of the NRAB on the merits of minor disputes, as Congress deemed finality to be an important aspect of the arbitral scheme. However, Congress also created a narrow role for judicial review in order to allow aggrieved employees to vindicate their rights if the NRAB decision was unreliable. In doing so, Congress established grounds for review that would ensure the integrity of the NRAB process. The district court failed to appreciate that the Railway's alleged conduct, if proven to constitute an attempt at extortion, was not merely a threat to Zimmerman but to the integrity of the arbitral process upon which the RLA relies. We reverse and remand to the district court, so that it may determine the appropriate procedure for allowing the Union to attempt to prove Kite's claim.

**REVERSED AND REMANDED.**